MERCURY CLEANING SYSTEMS, Inc., Plaintiff-Appellee,

v.

MANITOWOC ENGINEERING CORP. and The Manitowoc Company, Inc., Defendants-Appellants.

No. 12203.

United States Court of Appeals Seventh Circuit.

May 12, 1958.

Lowell C. Noyes, Chicago, Ill., A. F. Rankin, Clark, Rankin, Nash, Emmerling & Spindler, Manitowoc, Wis., for appellants, Davis, Lindsey, Hibben & Noyes, Chicago, Ill., of counsel.

George S. Stansell, Chicago, Ill., for appellee, Kenart M. Rahn, Parkhill, Severns & Stansell, Chicago, Ill., of counsel.

Before DUFFY, Chief Judge, and FINNEGAN and HASTINGS, Circuit Judges.

HASTINGS, Circuit Judge.

This action was brought to recover damages for injury to plaintiff's [1] business and reputation and for loss of profits alleged to have been sustained by reason of a breach of warranty by defendants [2] as a result of the discontinuance of the sealing of a certain valve in a dry cleaning machine manufactured under contract by defendants for plaintiff. The trial was to the court which found for plaintiff and entered judgment for $98,-284.33 damages from which this appeal is taken. The errors relied upon arise from the refusal of the trial court to grant defendants' motions for dismissal, from its ruling on the admission of certain evidence (plaintiff's Exhibit No. 34) and from its Finding of Fact No. 27.

Disputes arising out of the business relationship of the parties from 1945 to 1952 resulted in plaintiff suing defendants in the district court in 1952. The subject matter of that prior litigation was different from the dispute giving rise to the instant suit. Following several months of negotiations that cause was settled without trial, and on May 14, 1953, the parties signed a settlement agreement and release, defendants paid plaintiff $110,000 and the action was dismissed on its merits. Defendants contend that such release bars plaintiff's claims in Count I because of its broad general terms and the expressed intention of the parties to compromise and settle everything arising from their business relationship (excepting two matters with which we are not here concerned). Plaintiff says this release is no present bar because it was intended to release only claims then in controversy and that its language is not broad enough to cover the present dispute. The release of May 14, 1953 is the subject of Count II

1. Plaintiff, Mercury Cleaning Systems, Inc., an Illinois corporation, and its predecessor, since 1941 have sold a package dry cleaning machine consisting of a washer-extractor, tumbler and filter, employing a petroleum solvent, to professional dry cleaners through jobbers.

2. Defendants, Manitowoc Engineering Corp., and The Manitowoc Company, Inc., and their predecessor, Manitowoc Shipbuilding Company are Wisconsin corporations which manufactured dry cleaning machines for plaintiff and shipped them to plaintiff's customers from 1945 through 1953 by virtue of a verbal agreement made in 1945.

of the present complaint in which count plaintiff asks the court to determine the meaning of this agreement and whether it bars plaintiff's claims in this action. The trial court found this issue favorable to plaintiff.

If the settlement agreement of May 14, 1953 is a complete release and a bar to plaintiff's claims set out in Count I, then we need look no further. We shall pass upon that issue first.

In its Findings of Fact Nos. 17, 19, 24 and 25, the court below found that the release makes no mention of leakage resulting from defendants' failure to seal the valve, that at no time in the settlement negotiations was the subject of defendants' failure to seal the valve or adequately test the machines discussed, that on May 14, 1953 plaintiff did not know that defendants were not sealing the valve, and that it was not until July 23, 1953 that plaintiff learned of defendants' failure to seal the valve and adequately test the machines. We believe the evidence supports these findings. Rule 52 (a) of the Federal Rules of Civil Procedure, 28 U.S.C.A.

There is some general language in the release but we conclude that it related only to disputes then in controversy, and that the trial court correctly concluded that the settlement agreement "did not, and was not intended to, release" defendants from the claims now in suit.

The remaining contested issues resolve themselves into the ultimate determination of whether there was a causal connection between defendants' omission of the valve seal and plaintiff's loss of profits in 1954, and, if so, whether plaintiff proved such attributable damage with reasonable certainty. A determination of these matters requires a further statement of the factual background.

In 1945, defendants began the manufacture of dry cleaning units for plaintiff under an oral agreement, price and terms being determined as each order was placed. These first machines were largely patterned after a model submitted by plaintiff and such machines were to be constructed to meet with the approval of Underwriters Laboratories, Inc., (U/L). U/L is a non-profit corporation organized for the purpose of eliminating the risks of fire hazards resulting from the use of the tested machines. U/L performs this function by inspecting and examining products and the process of their manufacture, and, on approval thereof, issues its "Procedure" which sets forth its approved method of construction, production and testing. Approval of these units was obtained and never withdrawn.

In 1946, after producing a number of dry cleaning units for plaintiff, defendants suggested to plaintiff that defendants design and manufacture a new model unit using petroleum solvent, incorporating improvements and less expensive methods of operation, plaintiff to pay the engineering development. This was agreed upon, the model to be known as Model 3000 and to be approved by U/L. Plaintiff engaged U/L to make the initial examination and testing of the unit and periodic examinations thereafter. U/L gave its approval and in writing up its "Procedure" described the top brass plate of the 3-position valve as being sealed to the valvehead with a mixture of litharge and glycerine, as described in defendants' shop drawings of the unit, (and prescribed that defendants test the units for and eliminate leakage prior to shipment). U/L continued its inspections throughout the period of manufacture of Model 3000 and did not withdraw or modify its approval. The first units of the Model 3000 were sold in the summer of 1948. About this time, with plaintiff's consent and after plaintiff declined to participate, defendants determined to produce for sale on their own account a perchlorethylene (perc) dry cleaning machine using a synthetic solvent. These came on the market in 1950, and thus defendants became a competitor of plaintiff while continuing to manufacture its Model 3000 for plaintiff.

About October, 1949, after manufacturing 25 of the Model 3000 cleaners for plaintiff, defendants modified their man-

ufacturing procedure by omitting the sealing (with a litharge-glycerine mixture) of the top brass plate of the 3-position valve of the unit. The testimony was that this change was made by the chief design engineer of defendants who decided the omission of the sealing would not affect the cleaning operation of the machine. The Model 3000 cleaner was designed for use as a "single-bath" cleaning unit.

Defendants' chief designer testified that in October, 1951, plaintiff's president inquired of him whether the Model 3000 could be altered to permit the use of two different solvents or cleaning agents at two different times in the clothes-washing cycle, thus converting it into a "two-bath" cleaning unit. He advised plaintiff's president that the Model 3000 unit would not be suitable for the two-bath cleaning operation, *without alteration*. In 1952, without the knowledge or advice of defendants, plaintiff developed an auxiliary unit for use with the Model 3000 unit known as two-bath rinse attachment, to be attached to the Model 3000 unit. Plaintiff began selling these to the trade in January, 1953, with instructions on how to attach the rinse unit to the Model 3000 machine, and defendants first learned of this in February, 1953. Defendants continued to manufacture the Model 3000 machine for plaintiff until some time in 1953 at which time plaintiff undertook its own production.

Plaintiff had knowledge that there was some leakage of solvent through the 3-position valve of the Model 3000 machine and complained of it for several years prior to 1953, but did not learn of the omission of the valve seal until July, 1953, at which time it requested defendants to seal the valve and test against leakage on the undelivered 56 units. Defendants sealed 23 units but not the remainder. It will be recalled that this represented the cleanup of the business relations between the parties following their settlement agreement of May 14, 1953. This action was commenced in April, 1955.

Prior to 1954, plaintiffs sold an average of 242 units of the Model 3000 machine from 1949 through 1953. In 1954 it sold 137 units, in 1955, 127 units and in 1956, 109 units. During the 1949–1953 period the 3-position valve was unsealed. Plaintiff sold 99 units of its rinse attachment in 1953, 63 units in 1954, 9 units in 1955 and none thereafter. The following comparison of sales of their competitive units seems pertinent:

| Plaintiff's Sales (Petroleum Units) | | Defendants' Sales (Synthetic Units) | |
|---|---|---|---|
| 1950 | $684,000 | 1950 | $255,000 |
| 1951 | 811,000 | 1951 | 315,000 |
| 1952 | 693,000 | 1952 | 655,000 |
| 1953 | 880,000 | 1953 | 820,000 |
| 1954 | 637,000 | 1954 | 616,000 |
| 1955 | 661,000 | 1955 | 819,000 |
| 1956 | 600,000 (est.) | 1956 | 898,000 |

It will be seen that the sales of both parties were reduced in 1954 and both increased in 1955. (The trial court awarded damages to plaintiff for the year 1954 alone.)

Plaintiff's net profits before taxes on the units sold during 1954 through 1956 were as follows:

| | |
|---|---|
| 1954 | $174,294 |
| 1955 | 119,226 |
| 1956 | 149,094 |

Plaintiff contends that if it had sold 242 units in 1954 (the average of the preceding five years) instead of the 137 units actually sold, its additional net

profits in 1954 would have been $113,324 (added to the $174,294 shown above), and that this represents its loss for 1954, and that such loss was caused by defendants' alleged breach of warranty in not sealing the 3-position valve. The trial court adopted this method of computing plaintiff's loss in its Finding of Fact No. 38, and after allowing a credit to defendants (Finding No. 39) determined plaintiff was entitled to judgment against defendants in the sum of $98,284.33 (Finding No. 40).

After finding that defendants' failure to seal the valve caused leakage which in turn directly caused plaintiff's unit sales to decline (Finding No. 35), the trial court found further in No. 37: *"That a projection of the loss of anticipated profits beyond the year 1954 as being due directly to the defendant's breach is too speculative and uncertain."* (Our emphasis.)

There was evidence to support defendants' contention that there were several intervening or contributing causes of plaintiff's 1954 decline in business, attributable to plaintiff itself, precluding it from recovering damages from defendants. These causes were claimed to be plaintiff's sales of its two-bath rinse attachment to a machine not designed for two-bath cleaning; failure of plaintiff to heed defendants' warning that the machine was not suitable for use of more than one cleaning agent; failure of plaintiff to recognize the trend in the industry away from machines using petroleum solvents to those using synthetics; and plaintiff's voluntary agreement that defendants might make and sell a "perc" machine in competition with plaintiff's petroleum machine.

We have read the entire record in this cause to find support for the findings of the trial court that there was a causal connection between the omission of the valve seal and the injury to plaintiff's business and reputation, and that such damages were proved with the required degree of certainty. Fully realizing the weight to be given the findings of the trial court under Rule 52(a), 28 U.S.C.A.

and always being reluctant to disturb them on appeal, nevertheless we have come to the inescapable conclusion that the trial court's findings in this regard are clearly erroneous and must be set aside.

We fail to find in the record any evidence showing that plaintiff's business decline in 1954 was caused by defendants' alleged breach of warranty in not sealing the valve in question or properly testing the machines for leakage, except the isolated self-serving statement of plaintiff's president that they "judged it [the business decline] to be [the result of] the reputation that our unit had for excessive leakage, which was extremely evident in 1953 and parts of 1954." We need cite no authorities to support the proposition that there must be established a causal connection between plaintiff's loss in 1954 and defendants' alleged breach of warranty. We conclude there is a complete failure of proof in this respect.

Likewise, we hold that plaintiff's damages, if any, have not been shown with reasonable certainty. Plaintiff sought to recover damages under the theory of its complaint both prior to and after May 13, 1953. The trial court made no findings of any injury to plaintiff prior to 1954, awarded damages for 1954, and denied recovery after 1954 for the reason that the loss of anticipated profits in that period chargeable "to the defendant's breach is too speculative and uncertain." We think the same reasoning which caused the trial court to ignore the period before 1954 and to reject plaintiff's claims after 1954 as being too speculative and uncertain applies with equal force to the year 1954. It should also be noted that the trial court limited plaintiff's recovery to its loss of anticipated profits, highly speculative at best, and then resorted to an extremely uncertain method of calculation by averaging the sales of the preceding years and adjusting expenses "which would have been incurred" in 1954. Plaintiff's sales and profits declined in 1954 and increased again in 1955, as did those of defendants.

We find that such decline was not shown with any degree of reasonable certainty to have been attributable to defendants' alleged breach of warranty. None of plaintiff's loss of anticipated profits in 1954 is found by the court to have resulted from other causes. The evidence is lacking in definiteness and clarity to establish that the loss of customers was caused *solely* by defendants' breach.

■ The issue of damages in this cause is governed by the law of Wisconsin. While it is true that loss of profits is a proper measure of damages in Wisconsin, and that past profits of an established business constitute a legitimate basis upon which to estimate the future profits of the same business (Huebner v. Huebner, 1916, 163 Wis. 166, 157 N.W. 765), such matters must be established to a *reasonable certainty* and they cannot be based on speculation or guess work. Lieberthal v. Glens Falls Indemnity Co., 7 Cir., 1949, 174 F.2d 638, 640; Paramount Fuel Co. v. Fuerst, 1929, 199 Wis. 188, 225 N.W. 727. "One of the elements for recovery of loss of profits is that they must be capable of ascertainment with reasonable certainty." American Steam Laundry Co. v. Riverside Printing Co., 1920, 171 Wis. 644, 650, 177 N.W. 852, 854.

■ Since we hold that the evidence is not sufficient to establish the causal connection between plaintiff's loss of anticipated profits and defendants' alleged breach of warranty, and that the loss of such profits, if any, as may be attributable to defendants' misconduct is both speculative and uncertain, it is not necessary for us to pass upon the other errors claimed by defendants.

We hold that the district court erred in rendering judgment in favor of plaintiff and in denying defendants' motions for dismissal.

The Judgment below is reversed and this cause is remanded for further proceedings in accord with this opinion.

FINNEGAN, Circuit Judge.
I concur in the result.