HOWARD INDUSTRIES, INC., a corporation, Plaintiff,

v.

RAE MOTOR CORPORATION, a corporation, Defendant.

No. 6396.

United States District Court
E. D. Wisconsin.

Aug. 18, 1960.

470

Carroll R. Heft and Glenn R. Coates, Racine, Wis., for plaintiff.

Rex Capwell and Richard F. Foltz, Racine, Wis. and Norman C. Skogstad and Kurt H. Frauen, Milwaukee, Wis., for defendant.

GRUBB, District Judge.

This is an action for a breach of contract wherein the issue of liability was severed from damages. The liability question was tried first and resulted in a finding for the plaintiff. See Howard Industries, Inc. v. Rae Motor Corporation, D.C.E.D.Wis.1958, 165 F.Supp. 646, affirmed 7 Cir., 267 F.2d 430, in regard to this question and for the factual background of the case.

Thereafter the issue of damages was referred to a master who found that plaintiff was entitled to damages in the sum of $99,466.84. This figure represents the profit the plaintiff would have made on all sales made by the defendant, Rae Motor Corporation (hereinafter referred to as "Rae"), to customers which were common to the two parties over a ten year period from 1950 to 1959. The master found by necessary inference that but for the breach, plaintiff would have made the sales which the defendant actually made to common customers during that period.

The defendant's objections to various findings of fact and conclusions of law, as contained in the master's report, are before the court.

While defendant has made eleven specific objections to the report, there are three general arguments which it pursues in its brief.

The defendant's first argument is that certain statements of plaintiff's counsel made during the trial on the question of liability constitute judicial admissions which limit damages to those sales made by Rae to common customers who were first sold by Howard Industries, Inc. (hereinafter referred to as "Howard"), or the Electric Motor Corporation (a forerunner of the present corporate plaintiff). Defendant contends that no damages can be assessed where Rae made the first sale even though the buyers were later sold by Howard. The statement reads as follows:

"The Court: What can there be to show that customer A wouldn't have gone to Delco? It is a well known motor.

"Mr. Coates: Only, again, reasonable probability; the fact that they had purchased from EMC before. That's what our showing will be based on. We won't attempt, for example, to claim customers that EMC had never sold to. We do not pretend that every single item that they sold we would have sold, but we can show reasonable probability that we would have sold, and for that reason also each continuing motor which is manufactured is that same breach."

In support of its contention, the defendant cites many cases and treatises on the point that judicial admissions are binding. Representative of these citations is the following quotation from 31 C.J.S. Evidence § 361, pp. 1136–1137:

"*A distinct and formal admission* made by an attorney acting in his professional capacity on a trial binds his client as a judicial admission, unless withdrawn for proper cause; * * *. When such admissions are made in the counsel's professional capacity, *for the purpose of dispensing* with proof of some fact, or modifying the severity of some rule of practice, and to that end *are distinct and formal*, they bind the client, whether made during, or even after, the trial." (Emphasis added.)

The statement of plaintiff's counsel made during the trial *on the issue of liability* does not constitute a judicial admission. It was merely a casual response made during argument. There appears to be no intention on the part of counsel that the statement should be binding.

This conclusion is buttressed by the fact that the statement was made when the question of liability, rather than damages, was being tried. It related to a theory of liability which was not adopted by the court. It is likewise interesting to note that nowhere does defendant contend that it or the court was

misled or relied on the statement to its detriment.

Defendant was not misled by the statement and did not act in reliance upon it. It was clear that plaintiff would claim loss of profits on all of defendant's sales of this motor. Defendant acknowledged that plaintiff would make this claim by various passages in its memoranda in reference to the issue of damages, which memoranda were filed after the appeal and long after the statement in question was made by plaintiff's counsel. For example, in defendant's memorandum in support of its proposed order of reference, it is stated on page 5:

"Plaintiff *consistently* takes the position that it may be *reasonably inferred that plaintiff would have made the sales made by defendant* had the latter met the terms of the agreement." (Emphasis added.)

On page 8 of this memorandum it is said:

"It does not necessarily follow in this case that all motors sold by Rae Motor Corporation housed in the casing identified as Exhibit 6 would have been sold by Howard Industries, Inc. Conceivably sales lost by Howard, if any, could be attributed to dissatisfaction on the part of its customers with the performance of the motor which it marketed."

Further, plaintiff's position was made clear in the proceedings before the master on plaintiff's motion for information as to defendant's total sales of this motor.

Defendant's second argument is to the effect that on the evidence submitted there is no possible inference which would support the master's finding that, but for the breach, plaintiff would have enjoyed all the sales made by the defendant to common customers. This condition is especially urged in regard to those customers who, although common customers, were first sold by Rae.

The basis for this argument is the contention that plaintiff has simply submitted evidence that the sales of its 11A motor declined after the breach of the contract while defendant's sales of its M–1 motor have increased and has made no attempt to connect its loss of sales with the breach of contract.

Plaintiff has not proven individual customer by individual customer that each would have purchased from Howard except for the breach. It has basically rested its case on statistical information. The court cannot say that the inference which flows from these figures does not support the findings of the master. Rule 53(e) (2), F.R.Civ.P., 28 U.S.C., provides that "the court shall accept the master's findings of fact unless clearly erroneous." The following factors tend to support the master's conclusion that plaintiff would have made all sales which Rae actually made if defendant had not breached the contract:

1. Compared to prior years, plaintiff suffered severe losses in its sales of 11A motors after the breach of contract, which contract was entered into on August 15, 1949. For the three year period preceding the contract from 1947 through 1949, plaintiff's total sales of 11A motors amounted to $1,025,052, or an average of $341,684 per year. For the period from August 15, 1946 through 1949, plaintiff's sales to common customers amounted to $524,643.23, or an average of $131,160.80 a year. By contrast, in the five year period subsequent to the breach—that is, 1950 through 1954—plaintiff's total sales amounted to $569,-931.64, an average of $113,986.33 a year, and sales to common customers amounted to $180,985.92, an average of $36,197.18 a year.

2. Compared to prior years, defendant enjoyed greatly increased sales of its M–1 motor after the breach of contract. For the three year period preceding the contract from 1947 through 1949, defendant's total sales of M–1 motors amounted to $477,961, or an average of $159,320.67 per year. For the period from August 15, 1946 through 1949, defendant's sales to common customers amounted to $277,225.65, or an average of $79,207 per year. By contrast, in the

next five year period subsequent to the breach—that is, 1950 through 1954—defendant's total sales amounted to $1,-597,142.38, an average of $319,428.48 a year, and sales to common customers amounted to $1,193,439.50, an average of $238,687.90 per year.

3. Plaintiff's losses took place in a period when the market for fractional motors was expanding.

4. Plaintiff's losses took place during a period when sales of its other lines of products were increasing.

5. Considering that there was an expanding market in the fractional motors field, plaintiff's losses in sales can be classed as roughly comparable to defendant's gains in sales. The greatest gains and losses took place in the common customer area.

6. In the overall picture from 1950 to 1959, a pattern of recovery in the sales of 11A motors by the plaintiff is readily apparent the further we go from the breach.

7. Plaintiff's selling efforts in regard to its 11A motor were constant and vigorous.

8. No reasons appear, other than the breach of the contract, which would account for such a severe drop in sales.

9. The master found that defendant's breach was deliberate. The permissible inference from this fact is that defendant must have considered the casing design of its motor to be extremely important in its sales efforts.

■ Although it cannot be said that the master's findings were clearly erroneous, there are a number of contentions put forth by the defendant which should be touched on. For example, defendant objects to finding of fact number 13 which is:

> "During the period in question, Howard and Rae were the only users of the casing design represented by Exhibits 1 and 6, with the exception of Delco, which used a similar casing in a 6 and 12 volt motor. Most 11A and M–1 motors were adapted for 110 or 220 volts."

It is defendant's contention that this finding is contrary to a statement in the court's opinion on the liability question to the effect that there were "five other manufacturers of this type motor." This argument is obviously based on an erroneous assumption as to the meaning of the phrase "type motor." The court in its opinion and in its findings of fact was referring to fractional horsepower motors in general when it used the phrase in question. Thus, while the court found that there were a number of manufacturers of fractional horsepower motors, it did not find that the *motor casings* of these manufacturers were similar.

■ The defendant further contends that the testimony of its witnesses proves that the shape of the motor casing is of little consequence in whether a sale is made to a particular customer. While it is true that there is testimony to this effect in the record, it is sufficient to say that there is other evidence in the record which tends to rebut this argument. This was a question of fact for the master to determine, and considering all the evidence, it cannot be said that he made a clearly erroneous determination.

One factor which the master might have considered in this regard is the finding that the breach of contract was not inadvertent. There certainly is substantial evidence to uphold this finding, and it is extremely material in regard to the degree of importance which the defendant attached to the shape of its motor casing. The wrapping on a package is an important factor in its merchandising. A lady may be more sought after on account of her fine furs and feathers than because of her less apparent qualities.

■ Other contentions of the defendant which are similar to the last mentioned are the arguments that plaintiff's losses on the 11A motors were caused by mismanagement and preoccupation with government contracts, and that since there were competitors in the field, the inference is present that a sale made by Rae would not automatically flow to

Howard but for the breach. Again, these arguments amount to nothing more than factors which the master might have taken into consideration but which on the present record do not amount to arguments which he was obligated to accept. In both cases, there is ample evidence upon which the master might have made a contrary determination.

 The plaintiff in this case had the burden of proving to a reasonable certainty that its lost sales were due to the breach of contract. Wawak & Co., Inc. v. Kaiser, 7 Cir., 1942, 129 F.2d 66; Mercury Cleaning Systems, Inc. v. Manitowoc Engineering Corp., 7 Cir., 1958, 255 F.2d 318; Consumers Petroleum Co. v. Consumers Co. of Illinois, 7 Cir., 1948, 169 F.2d 153. However, once evidence of damages has been established, plaintiff may recover even though the amount is not capable of exact mathematical ascertainment. In such cases, the trier of fact must fix damages by reasonable estimate and approximation. Wawak & Co., Inc. v. Kaiser, supra.

In the Wawak decision, supra, which is very similar factwise to the instant case, the court stated in 129 F.2d on page 68:

> "We believe, however, that the evidence was sufficient to justify the master's finding that plaintiff had sustained its burden and, in the absence of clear error on his part, the findings should be upheld. * * * If defendants made infringing sales to plaintiff's list of customers, *and plaintiff was selling the same goods to the same customers, and plaintiff was able and willing to make such infringing sales, it is only reasonable to conclude that plaintiff would have made such sales if there had not been such infringement.* * *" (Emphasis added.)

See also 1 Restatement, Contracts, § 331, where at page 515 the following is found:

> "a. The requirement of reasonable certainty does not mean that the plaintiff can recover nothing unless he establishes the total amount of his harm; nor does it mean that he cannot get damages unless he proves the exact amount of his harm. The requirement merely excludes those elements of harm that cannot be evaluated with a reasonable degree of certainty. There is usually little difficulty in proving the amount of actual expenditures, even though it may be impossible to prove the amount of expected profits (see § 333). *Furthermore, there are cases in which the experience of mankind is convincing that a substantial pecuniary loss has occurred, while at the same time it is of such a character that the amount in money is incapable of proof.* In these cases the defendant usually has reason to foresee this difficulty of proof and should not be allowed to profit by it. *In such cases, it is reasonable to require a lesser degree of certainty as to the amount of loss, leaving a greater degree of discretion to the jury, subject to the usual supervisory power of the court."* (Emphasis added.)

 Defendant's last main argument revolves around a single common customer named "Niagara Therapy." Sales by the defendant to this firm were very substantial. The customer was first sold by Rae. In addition, there is testimony in the record that Niagara Therapy's tolerances were quite large. The motor casing shape was of little significance to it. It actually used motors other than Howard's 11A or Rae's M–1 in the device it manufactured.

Basically, the arguments made at this point in regard to a specific common customer are the same questions, although somewhat accentuated, which were raised by defendant in its more general argument. While it does appear that another conclusion might have been reached by the master in regard to this specific customer, the conclusions reached in the prior discussion are equally applicable here for the state of the record is such that

the master was not obligated to accept the contentions of the defendant. It cannot be said that his determination was clearly erroneous.

Defendant's final argument in regard to the sales to Niagara Therapy involves the contention that said sales were of motors which were in no way confusingly similar with Howard's casing due to the fact that the great majority of the motors were equipped with patented end oil caps, while the normal M-1 casing is not. The master held it was not necessary to decide the question for in his opinion the exhibits which purported to prove that the vast majority of motors sold during the period from 1951 to 1956 to Niagara Therapy by Rae were clearly in error. The words of the master are as follows, pages 9 and 10 of his report:

"The end cap patent (Exhibit 137) was applied for on November 5, 1955. 35 U.S.C. § 102(b) provides that any person shall be entitled to a patent unless:

" '(b) the invention was patented or described in a printed publication in this or in a foreign country or in *public use or sale* in this country, *more than one year prior to the date of the application* for the patent in the United States.' (Emphasis Supplied).

\* \* \* \* \* \*

"Every patent application must be accompanied by the inventor's sworn oath that the invention has not been 'in public use or on sale in the United States more than one year prior to this application'. See Rules of Practice, United States Patent Office, September, 1955, page 105, form 11. Although the inventor's oath on the instant application is not in evidence, the patent could not and would not have been issued without it. Rule 56, *op. cit. supra,* p. 29.

"It cannot be lightly inferred that the applicant, Everett K. Hansen filed a false oath in support of the patent application and thereby obtained an invalid patent. The record discloses no prior application by Mr. Hansen for this or a similar patent, and it is undisputed that the application was filed on November 5, 1955.

"Thus, Rae could not have made any appreciable sales of these patented end cap motors prior to November 5, 1954, at the very earliest. These facts cast so much doubt upon the correctness of the Niagara Therapy figures on Exhibit 139 that it cannot be deemed of probative value."

Defendant challenges these findings on the ground that the validity of the figures contained in the exhibit were not challenged in the trial, and that the issue of validity or invalidity of a patent was not within the issues presented to the master and not material on the question of damages.

The trier of fact must decide what evidence is probative and what is not when a question of credibility is raised. In this case, although the exhibit was admitted without objection, still the fact that a patent application must contain a sworn statement raises such doubts as to the reliability of the exhibit that it was certainly within the power of the master to disregard it. It might be noted that an officer of the plaintiff testified that the oil caps were first used by Rae on its motors sold to Niagara Therapy in either 1954 or 1955 (R. 109). In any event, these patented end caps were mere attachments to the basic motor and, thus, not being an integral part of the casing, could not be considered as a differentiating factor. At most, this factor of differentiation, as the master noted, seems to be one that should have been raised at the trial on the issue of liability.

In summary, it might be stated that while the damages in this action were not proven to an absolute certainty, the nature of the case is such that an exact mathematical ascertainment is im-

**476**

possible. Even defendant in its brief agrees that it would be inequitable to require plaintiff to call each common customer to meet its burden of proof. A reasonable certainty, in view of all the circumstances of the case, is all that is necessary. It is my opinion that such burden has been met.

While the master in computing the damage figure did include all sales made by Rae to common customers, the award was nonetheless quite conservative in some important respects. For example, all sales of the defendant to noncommon customers were excluded from consideration. In addition, the net profit percentages of Howard which were used in the computation by the master were actual figures for the years in question. Thus, no consideration was given to the fact that had Howard actually made Rae's sales to common customers, these sales would have been excess sales in any given year, and the percentage of profit on these excess sales may well have been higher than the normal profit realized by Howard.

There being no objections to the master's bill for costs and disbursements and the court deeming it reasonable, the bill is hereby approved. The plaintiff is directed to pay to the master the balance due him, less any funds deposited in court for that purpose. The clerk is directed to pay the unexpended balance of the funds on deposit to the master.

The objections to the master's report are hereby overruled. The master's report is adopted by the court. The clerk is directed to enter judgment in favor of the plaintiff and against the defendant in the sum of $99,466.84 damages, together with costs and disbursements in this action to be taxed by the clerk. The costs and disbursements are to be taxed prior to the entry of judgment. Included in the costs are to be all sums paid by the plaintiff to the master for his services and disbursements or deposited by plaintiff with the clerk of this court for the purpose of payment to the master.