**FOREST LABORATORIES, INC., Plaintiff-Appellee (Cross Appellant),**

v.

**The PILLSBURY COMPANY, Defendant-Appellant (Cross Appellee).**

**Nos. 71–1318, 71–1319.**

United States Court of Appeals, Seventh Circuit.

Nov. 4, 1971.

Rehearing Denied Dec. 10, 1971.

Ronald E. Lund, Minneapolis, Minn., C. Willard Hayes, Washington, D. C., Arthur H. Seidel, Milwaukee, Wis., Michael D. Ellwein, Minneapolis, Minn., for defendant-appellant-cross appellee; Quarles, Herriott, Clemons, Teschner & Noelke, Milwaukee, Wis., of counsel.

Arthur A. March, New York City, Maurice J. McSweeney, Milwaukee, Wis., Howard Solomon, New York City, James P. Brody, Foley, Sammond & Lardner, Milwaukee, Wis., for plaintiff-appellee-cross appellant.

Before DUFFY, Senior Circuit Judge, and CUMMINGS and PELL, Circuit Judges.

CUMMINGS, Circuit Judge.

Plaintiff, a corporation engaged in producing and packaging effervescent sweetener tablets, sued defendant Pillsbury Company, the well-known manufacturer of food products, alleging that Pillsbury had purloined certain Forest trade secrets.[1] Apart from an antitrust count that was subsequently dismissed, the complaint was based on diversity of citizenship, and the parties are in accord that Wisconsin law is governing.[2]

After hearing the testimony of various witnesses and considering the exhibits, the district court agreed with plaintiff that it had successfully developed a process for packing effervescent sweetener tablets so as to lengthen their shelf life, Forest Laboratories, Inc. v Formulations, Inc., 299 F.Supp. 202 (E.D.W.1969). One step of this packaging procedure was adjudged to be plaintiff's confidential trade secret.[3] That step was described as follows: "Before packaging, the tablets are to be tempered in a room having 40% or less relative humidity for a period of between 24 to 48 hours."

In determining what is a trade secret, Wisconsin applies the rule of the Restatement of Torts. Abbott Laboratories v. Norse Chemical Corporation, 33 Wis.2d 445, 456, 147 N.W.2d 529 (1967). A trade secret is defined in Section 757, comment (b), of the Restatement as follows:

"A trade secret may consist of any formula, pattern, device, or compilation of information which is used in

---

1. Formulations, Inc., another producer of effervescent sweetener tablets, was originally also a defendant. However, during the course of trial, Formulations was dismissed because it did not have notice of Forest's alleged trade secrets. That dismissal is not urged as error here.

2. Since Forest claimed that Pillsbury used its trade secrets solely in Omaha, Nebraska, the law of that state would seem pertinent. However, the parties do not challenge the district judge's choice of Wisconsin law, nor have they shown that Nebraska and Wisconsin law differ. Therefore, we will also treat Wisconsin law as governing.

3. The trial court found that four steps in the packaging procedure qualified as trade secrets, but that of these only the tablet-tempering step was plaintiff's secret. The court's conclusion that the three material-tempering steps were suggested to Pillsbury by another source is supported by the evidence.

one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a * * * process of * * * treating or preserving materials * * *."

This definition is clearly broad enough to cover the above-described tempering step employed by Forest. The standards for determining trade secrets are well set forth in Cataphote Corporation v. Hudson, 422 F.2d 1290, 1293–1294 (5th Cir. 1970). It was there noted that uniqueness in the patent law sense is not an essential element of a trade secret, for the patent laws are designed to encourage invention, whereas trade secret law is designed to protect against a breach of faith. However, the trade secret must "possess at least that modicum of originality which will separate it from everyday knowledge." Cataphote Corporation v. Hudson, 444 F.2d 1313, 1315 (5th Cir. 1971). As stated in an authoritative treatise on this subject:

"As distinguished from a patent, a trade secret need not be essentially new, novel or unique; therefore, prior art is a less effective defense in a trade secret case than it is in a patent infringement case. The idea need not be complicated; it may be intrinsically simple and nevertheless qualify as a secret, unless it is in common knowledge and, therefore, within the public domain." 2 Callman, Unfair Competition, Trademarks and Monopolies § 52.1 (3d ed., 1968).

Before finally determining that this tablet-tempering step was a trade secret, the district court weighed the six factors prescribed by Abbott Laboratories, supra, and the Restatement. They are:

1. The extent to which the information is known outside of the claimant's business.

2. The extent to which it is known by employees and others involved in his business.

3. The extent of measures taken by him to guard the secrecy of the information.

4. The value of the information to him and his competitors.

5. The amount of effort or money expended by him in developing the information.

6. The ease or difficulty with which the information could be properly acquired or duplicated by others.

The evidence which was discussed in the district court's opinion (299 F.Supp. at 206–207) and will not be reiterated here satisfied the district court and satisfies us that these criteria were met by plaintiff until it had obtained a patent on March 16, 1965, disclosing the tablet-tempering step. Since the element of secrecy evaporated with the issuance of the patent, the district court properly held that Pillsbury should not be held liable after the issuance of the patent.[4]

Even though it allegedly started using Forest's trade secret in Omaha,

4. In Shellmar Products Co. v. Allen-Qualley Co., 87 F.2d 104 (7th Cir. 1936), this Court permitted an injunction to continue against the wrongful user of a trade secret after a patent later made the information public. *Shellmar* was not a suit for damages and did not involve Wisconsin law. It did not bar this district judge from holding, as a matter of first impression, that under Wisconsin law an improper use of a trade secret . is an actionable wrong only prior to the issuance of the patent. See Tempo Instrument, Inc. v. Logitek, Inc., 229 F.Supp. 1, 2–3 (E.D.N.Y.1964) ; Schreyer v. Casco Products Corp., 190 F.2d 921, 924 (2d Cir.

1951) ; Conmar Products Corp. v. Universa'. Slide Fastener Corp., 172 F.2d 150, 155–156 (2d Cir. 1949). This holding may even be required by the Supreme Court's decisions in Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661, and Compco Corp. v. Day-Brite Lighting, Inc., 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669, delineating the preemptory relationship between federal patent law and state unfair competition law. Cf. Business Forms Finishing Service, Inc. v. Carson, (7th Cir. October 15, 1971) ; Columbia Broadcasting System, Inc. v. DeCosta, 377 F.2d 315, 319 (1st Cir. 1967).

Nebraska, commencing in January 1964, Pillsbury advances several contentions against liability. First, Pillsbury relies on the fact that its tempering was done in closed containers, whereas Forest's method utilized open containers. However, there was testimony that the tablets would still equilibrate in closed containers, and might do so in a day or two if the container were only in a dry environment. In any event, the user of another's trade secret is liable even "if he uses it with modifications or improvements upon it effected by his own efforts," as long as the substance of the process used by the actor is derived from the other's secret.[5] The purpose of Forest's and Pillsbury's tablet tempering was to place the tablets in an ambient condition. In our opinion, there was insufficient difference in the two methods to absolve Pillsbury from liability.

▮▮▮▮ Pillsbury purchased the assets of Tidy House Corporation on June 1, 1960. The district court found that the trade secret had been divulged by Forest to Tidy House on a confidential basis and that as Tidy House's successor, Pillsbury was bound by the confidential disclosure to Tidy House. On the state of this record[6] we cannot sustain the district court's conclusion. The well settled rule of American jurisdictions, including Wisconsin, is that a corporation which purchases the assets of another corporation does not, by reason of succeeding to the ownership of property, assume the obligations of the transferor corporation. 15 Fletcher, Cyclopedia of the Law of Private Corporations, § 7122 (1961 Rev. Vol.); Pennison v. Chicago, Milwaukee & St. Paul Ry. Co., 93 Wis. 344, 67 N.W. 702 (1896); Kloberdanz v. Joy Mfg. Co., 288 F.Supp. 817, 820 (D.Colo.1968); International Ass'n of Machinists and Local Lodge No. 954 v. Shawnee Indus., Inc., 224 F.Supp. 347, 352 (W.D.Okl.1963). Exceptions to this rule exist where (a) the purchasing corporation expressly or impliedly agrees to assume the liabilities of the seller, (b) the transaction amounts to a consolidation or merger of the two companies, (c) the purchasing corporation is merely a continuation of the selling corporation, or (d) the transaction is entered into fraudulently to escape liability. Fletcher, *supra,* at 191–195; Kloberdanz v. Joy Mfg. Co., *supra;* International Ass'n of Machinists and Local Lodge No. 954 v. Shawnee Indus., Inc., *supra.*

▮▮▮▮ There is no evidence that Pillsbury expressly agreed to assume all the liabilities and obligations of Tidy House, and in the absence of the purchase agreement[7] or any evidence of conduct or representations by Pillsbury that could support it, we cannot find an implied assumption of liabilities. Cf. Bouton v. Litton Indus., Inc., 423 F.2d 643 (3d Cir. 1970). Since no new corporation emerged from the transaction, a consolidation did not occur. 15 Fletcher, *op. cit.* § 7041, at 6–8. Contrary to the dis-

---

5. Restatement of Torts, § 757, comment (c), page 9.

6. The only evidence relating to the nature of the transaction was the testimony of Mr. John S. Rapp, the former president of Tidy House. He stated that the assets of Tidy House "were simply sold to The Pillsbury Company on an exchange of stock basis," that all the production facilities, patents, trademarks and attendant good will were included in the sale but the Tidy House real estate was not, that after the sale Tidy House leased the buildings housing the production facilities to Pillsbury for a term of five years with some kind of option, that Pillsbury operated the acquired business as its Tidy House Division, that all Tidy House's key personnel went over to Pillsbury, that there was no indebtedness for Pillsbury to assume, and that on approximately June 1, 1964, part of the assets involved in the sale, including all the Tidy House products except artificially sweetened items, were reacquired from Pillsbury. The agreement of purchase was never introduced in evidence. No testimony was taken as to which liabilities Pillsbury agreed to assume and which it excluded although Pillsbury's assertion that it excluded all unknown liabilities was not rebutted during argument. There was no allusion to the financial status of Tidy House Inc. and its ability to pay creditors following the sale.

7. See note 6 *supra.*

trict court's statement, what evidence there was indicated that not all the assets of Tidy House were sold to Pillsbury.[8] Apparently Tidy House, Inc. continued its corporate existence after the sale and leased to Pillsbury the buildings housing the facilities it had sold. There is no indication of the financial situation or the extent of the corporate activity of Tidy House following the transaction. Consequently, again on the strength of this record, we cannot conclude that the sale of assets amounted to a merger. Kloberdanz v. Joy Mfg. Co., *supra*, 288 F.Supp. at 821; see Copease Mfg. Co. v. Cormac Photocopy Corp., 242 F.Supp. 993, 1013 (S.D.N.Y. 1965). Pillsbury can hardly be said to be a mere continuation of Tidy House since the transfer of assets was not a part of a reorganization. 15 Fletcher, *op. cit.* §§ 7122 at 195–196, 7205 at 391–394. And finally there is no suggestion whatever that Pillsbury was acting in bad faith when it purchased the Tidy House business. In sum, we are not convinced that Pillsbury subjected itself to the obligation of secrecy as Tidy House's "successor." Moreover, the knowledge of Tidy House's employees cannot properly be imputed to Pillsbury just because they went to work for Pillsbury. Conmar Products Corp. v. Universal Slide Fastener Co., Inc., 172 F.2d 150, 156–157 (2d Cir. 1949). See Ferroline Corp. v. General Aniline & Film Corp., 207 F.2d 912, 923 (7th Cir. 1953).

Section 757(b) of the Restatement of Torts provides:

> "One who discloses or uses another's trade secret, without a privilege to do so, is liable to the other if
>
> \* \* \* \* \* \*
>
> "(b) his disclosure or use constitutes a breach of confidence reposed in him by the other in disclosing the secret to him \* \* \*."

Since Pillsbury does not stand in the shoes of Tidy House, plaintiff's confidant, Pillsbury's use of the secret does not come within the confines of § 757 (b).

Nevertheless, even though Pillsbury is not liable under § 757(b) of the Restatement of Torts for using Forest's trade secret as Tidy House's successor, the evidence shows that Pillsbury acquired actual knowledge of the confidentiality of the disclosure made by Forest to Tidy House. Thus Mr. Richard Egan, a former employee of Tidy House and of Pillsbury, and considered by the trial judge to be a credible witness, testified that he communicated the trade secret to Dr. Julian Stein, Fred McCarne, and possibly others employed by Pillsbury at a meeting in the middle of 1962. He also told them that the Forest process had been received in confidence by Tidy House.

Section 758(b) of the Restatement states:

> "One who learns another's trade secret from a third person without notice that it is secret and that the third person's disclosure is a breach of his duty to the other, or who learns the secret through a mistake without notice of the secrecy and the mistake,
>
> \* \* \* \* \* \*
>
> "(b) is liable to the other for a disclosure or use of the secret after the receipt of such notice unless prior thereto he has in good faith paid value for the secret or has so changed his position that to subject him to liability would be inequitable."

Thus under § 758(b) of the Restatement of Torts, Pillsbury would be liable for its use of the secret after receipt of the notice unless prior thereto it had in good faith paid value for the secret. To satisfy this exception, Pillsbury argues that it purchased the trade secret when it acquired Tidy House's assets, and that Mr. Egan's communications did not occur until well after the acquisition. However, the record does not show that Pillsbury paid anything specifically for the trade secret. For all that appears on

the record, Pillsbury's purchase of Tidy House assets at most involved only the purchase of its packaging facilities as part of the existing marketing structure, which included plaintiff as supplier. Nothing has been brought to our attention which would show that Pillsbury actually gave value for Tidy House's tempering expertise with a view toward independently exploiting that know-how for its intrinsic value. Comment (e) to § 758(b) of the Restatement states that "not every change of position prevents the recipient of a trade secret from being subjected to the duty not to disclose or use the secret after notice. The issue is whether the imposition of the duty would be inequitable under the circumstances." The mere possibility that some arbitrary portion of the purchase price could *ex post facto* be ascribed to the potential of the trade secret for Pillsbury's later independent use does not demonstrate a change of position which it would be inequitable not to protect under the circumstances. The purpose of Restatement § 758(b) is to protect bona fide purchasers and reasonable reliance, but it may operate harshly on those who have expended substantial sums in development of their trade secrets. See Developments in the Law—Competitive Torts, 77 Harv.L.Rev. 888, 950 (1964). For this reason, we require a specific showing that Pillsbury in good faith paid value for Forest's trade secret at that time, and since there is a dearth of such proof, under § 758(b) of the Restatement, it remained liable to Forest for using the trade secret after the receipt of notice.

■ Pillsbury next asserts that the special master's assessment of damages in the amount of $75,000 as approved by the district court was erroneous. Both parties agree that the "reasonable royalty" method of computing damages was properly invoked. According to that method, the primary inquiry in fixing a reasonable royalty is "what the parties would have agreed upon, if both were reasonably trying to reach an agreement." Egry Register Co. v. Standard Register Co., 23 F.2d 438, 443 (6th Cir. 1928); see Union Carbide Corp. v. Graver Tank and Mfg. Co., 282 F.2d 653 (7th Cir. 1960). Forest contends that under this method it was entitled to damages in excess of $1,000,000, while Pillsbury contends that the damages should be in the neighborhood of $7500.

Pillsbury argues that "the master merely plucked from the air the figure of $75,000 without any attempt to tie that figure to any objective criteria." Citing Mercury Cleaning Systems, Inc. v. Manitowoc Engineering Co., 255 F.2d 318 (7th Cir. 1958), Pillsbury concludes the $75,000 award is too speculative and uncertain to stand. That case involved damages based on straight loss of profits for breach of contract, and this Court held that the evidence had not clearly enough connected the loss of profits with the breach. The basis for an award of damages should be as explicit as the method of calculating the damages permits, but the reasonable royalty method used in this case is not amenable to a completely mathematical articulation. Here the master considered the factors of Forest's loss of profits, its profits prior to 1964, and its claimed cost of development, and to these factors he assigned values supported by ample evidence. But the master also correctly considered other factors not susceptible of precise valuation, such as Forest's ability to continue in the tablet-producing business, the nature of the trade secret, its utility, and advantages and extent of use. Enterprise Mfg. Co. v. Shakespeare Co., 141 F.2d 916, 920 (6th Cir. 1944). And, of course, the commercial posture of the parties must have entered into the master's picture. See *Egry Register Co., supra,* 23 F.2d at 443. Because of the type of factors considered and the necessarily judgmental process involved in constructing a hypothetical business agreement, we cannot fault any lack of specificity in arriving at what must necessarily be a reasonable approximation.

Both in the district court and in this Court, Pillsbury has objected to the spe-

cial master's finding of fact No. 8 that Forest had invested approximately $230,000 in developing its tablet-tempering process. Pillsbury argues that this amount includes expenditures which are not strictly attributable to the development of the trade secret in issue. The district court concluded Forest's testimony on that subject was "not inherently incredible," so that finding 8 was not clearly erroneous [9] and will not be disturbed. Federal Rule of Civil Procedure 53(e) (2), 52(a). In constructing a hypothetical royalty contract in accordance with the *Egry Register Co.* rule, it was not erroneous for the special master at least to give consideration to Forest's claimed cost of developing the tablet-tempering process. As the court below noted:

> "the special master did not adopt such figure as his recommended damages, but weighed it along with other factors, including the plaintiff's loss of profits and the limited period of time which was involved (January 1, 1964 to March 16, 1965)." (320 F.Supp. 211 at 212–213.)

Thus the special master utilized the $230,000 figure as relevant in deciding what developmental cost would and could Forest reasonably expect to recover in the price term of the hypothetical royalty contract. Accordingly, the figure need not be as precise as if the actual developmental cost for the trade secret were itself the measure of damages.

The district court awarded Forest $15,000 attorneys' fees, and Pillsbury argues that this was improper. Except when overriding considerations of justice compel them, it is the policy of federal and state courts to deny attorneys' fees in the absence of statutory authorization or agreement. Thus in an analogous situation involving unfair competition of the trademark variety, the Supreme Court approved the denial of attorneys' fees to the prevailing party. Fleischmann Distilling Corp. v. Maier Brewing Corp., 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475.[10] Just as the Ninth Circuit found no general federal rule or policy favoring an award of attorneys' fees to prevailing defendants in trade secret cases (Monolith Portland Midwest Co. v. Kaiser Aluminum, 407 F.2d 288, 298 (9th Cir. 1969)), we find none favoring an award to prevailing plaintiffs. Wisconsin law is to the same effect. See, *e. g.*, Baker v. Northwestern National Casualty Co., 26 Wis.2d 306, 318–322, 132 N.W.2d 493 (1965). In the absence of any overriding federal policy to the contrary, Wisconsin law should be followed. Aerosonic Corp. v. Trodyne Corp., 402 F.2d 223, 228–229 (5th Cir. 1968); 6 Moore Federal Practice ¶ 54.-

9. In this Court, Pillsbury has assailed factual findings Nos. 1, 2, and 4 of the special master. However, as shown in paragraph 16 of its objections below, Pillsbury objected only to finding No. 8. While the question of the sufficiency of the evidence to support the master's findings of fact may, as a rule, be raised on appeal though no objection has been made below (Fed.R. Civ.Pro. 52(b); 5 Moore, Federal Practice ¶ 53.11, at 2991 (2d ed. 1969)), in this instance Pillsbury's failure to object to master's findings Nos. 1 and 4 makes it too late to object here. To the extent that Pillsbury's objection to finding No. 1 may be valid, it would only show that the special master made a computational error. Had an objection been lodged in the district court, the defect could easily have been obviated. The objection to finding No. 1 did not challenge the sufficiency of the evidence to support a factual inference made by the master. The objection to finding No. 4 stands on the same footing. With respect to finding No. 2, we find the objection to be without merit, for the master's finding was amply supported by the evidence.

10. Although the issue before the Supreme Court may be narrowly characterized as whether attorneys' fees are recoverable under the Lanham Act, that Act was silent as to attorneys' fees. Thus the Supreme Court thoroughly explored the question whether there was an exception under a federal court's general equity power to the American rule disfavoring the award of attorneys' fees. The conclusion that none of the limited exceptions that have evolved was relevant applies equally to defeat plaintiff's reliance on them here.

77 [2] at 1354–1355. We reject anything contrary to the foregoing in Carter Products, Inc. v. Colgate-Palmolive Co., 214 F.Supp. 383 (D.Md.1963), that may not be explicable by the factual differences.

■ Pillsbury also contends that the district court lacked jurisdiction. The trade secret phase of the amended complaint was based upon diversity of citizenship under 28 U.S.C. § 1332. Plaintiff is a Delaware corporation and Pillsbury also is a Delaware corporation, although the amended complaint erroneously referred to it as a Minnesota corporation. Formulations, Inc., subsequently dismissed as a defendant, was a Wisconsin corporation. Although there was no diversity jurisdiction against Pillsbury and diversity jurisdiction against Formulations disappeared with its dismissal, the amended complaint contained a second count against Pillsbury and Formulations, alleging they violated the federal antitrust laws. This claim against Pillsbury was not dismissed by the court until two months after the conclusion of the trial. "Considerations of judicial economy, convenience and fairness to litigants" certainly favor the retention of jurisdiction over state law issues, where both state and federal claims were tried together and the latter only dismissed after trial. United Mine Workers of America v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218. This is especially true in view of the fact that the jurisdictional objection was raised for the first time on this appeal. Cf. Rosado v. Wyman, 397 U.S. 397, 403–405, 90 S.Ct. 1207, 25 L.Ed.2d 442. Moreover, the resolution of the time lim-

it on liability may have implicated federal patent policy [11], making the exercise of jurisdiction even more appropriate. See *United Mine Workers, supra,* 383 U.S. at 727, 86 S.Ct. 1130. In these circumstances, we conclude that the district court had pendent jurisdiction. See Ortman v. Stanray Corporation, 371 F.2d 154, 157–158 (7th Cir. 1967).

■ Finally, Pillsbury asserts that the district court improperly refused to entertain its patent invalidity claim. Forest did not contend that Pillsbury had infringed Forest's patent,[12] and the parties stipulated to a judgment of non-infringement. Therefore, Pillsbury's argument that it might not be able in the future to raise defenses against this patent is frivolous. Since the previous charge of infringement was withdrawn, non-infringement was conceded, and no harassment or repeated charges of infringement appear, the district court was within its rights in deciding not to issue a declaratory judgment as to the validity of Forest's patent. See Drew Chemical Co. v. Hercules, Inc., 407 F.2d 360, 362 (2d Cir. 1969); Ortsman-Miller Machine Co. v. International Basic Economy Corp., 138 USPQ 108, 109 (N.D.Ill. 1963).

The additional arguments presented by the parties have been fully considered but are not sufficiently substantial to merit discussion. We conclude that the district court's factual determinations were not clearly erroneous and that apart from the award of attorneys' fees, its judgment was correct. Five-sixths of the costs shall be taxed against Pillsbury and one sixth against Forest.

Affirmed in part; reversed in part.

---

11. See note 4 *supra.*

12. A previous action brought by plaintiff against Pillsbury in the Southern District of New York for patent infringement and unfair competition was voluntarily dismissed on the same date that plaintiff commenced the action below.