Allen TIFT and Calvin Tift,
Barron County Department of Social Services, Plaintiffs-Appellants-Petitioners,

v.

FORAGE KING INDUSTRIES, INC., and Auto-Owners Insurance Company, Defendants-Respondents,

Vernon L. NEDLUND, and Woodrow W. Wiberg, d/b/a Forage King Industries or Nedlund Welding Works, Defendants.

Supreme Court

No. 80–1724. *Argued January 4, 1982.—Decided July 2, 1982.*

(Also reported in 322 N.W.2d 14.)

For the plaintiffs-petitioners there were briefs by *David M. Erspamer* and *Cwayna, Novitzke, Byrnes, Gust & Williams* of Amery, and oral argument by *Mr. Erspamer.*

For the defendants-respondents there was a brief by *James E. Garvey* and *Garvey, Anderson, Kelly & Ryberg, S.C.,* of Eau Claire, and oral argument by *James E. Garvey.*

HEFFERNAN, J.   The question posed in this case is whether a business corporation which acquired substantially all of the assets of a predecessor sole proprietorship but which is substantially the same business organization and manufactures an almost identical product as its predecessor may be liable for injuries caused by a defective product manufactured by the predecessor.  The circuit court for Barron county, JAMES C. EATON, Circuit Judge, concluded that the successor corporation could not be liable and granted the motion of the defendants for summary judgment dismissing the plaintiffs' complaint.

The court of appeals affirmed the trial court judgment, concluding that, because the original manufacturer was a sole proprietor, rather than a corporation, no "corporate" successor liability could exist.  It also relied upon the general corporate rule that, where a corporation has purchased the assets of another corporation, the successor corporation does not assume the liabilities of the selling corporation.

Because it is irrelevant that the predecessor business organization was a sole proprietorship, rather than a corporation, and because the present corporation is a mere continuation of the original business, we reverse the court of appeals and remand the cause for further proceedings.

The underlying accident occurred on October 4, 1975, when the plaintiff, Calvin Tift, seventeen years of age, was operating a tractor with a chopper box attachment used for cutting and removing silage from a field on his father's farm. Calvin was drawn into the chopper box and suffered severe and painful personal injuries. The allegedly defective chopper box which caused the injuries was manufactured in 1961–62 by a sole proprietorship doing business as Forage King Industries.

The record shows that, prior to 1957, Vernon L. Nedland, as sole proprietor, operated a welding works at Prairie Farm, Barron County, Wisconsin. In that year he sold his business to Woodrow W. Wiberg, who continued to operate as a sole proprietor under the name Nedland Forage King. The trial court found that the chopper box which allegedly cause the injuries to Calvin was built by Wiberg's sole proprietorship in 1961 or 1962. At the time the chopper box was built, Wiberg was operating under the name of Forage King Industries. In 1968, Wiberg and Nedland formed a partnership and, as the trial judge found, it shortly thereafter "metamorphosed into a corporation." As originally incorporated, Wiberg and Nedland were the sole shareholders of the corporation known as Forage King Industries, Inc. The corporation moved its place of operations from Prairie Farm to Ridgeland, Wisconsin. It retained the same employees and manufactured identical products, including chopper boxes, retained the same name, Forage King Industries, Inc., and sold to the same dealers as had the sole

proprietorship when owned solely by Wiberg. Late in 1968, Nedland sold his stock to Wiberg but remained as a director of the corporation for several years. Wiberg managed the corporation until January 15, 1975, when it was acquired by the Tester Corporation by the purchase of all of Wiberg's stock. Forage King Industries, Inc., remained at the same location and continued to manufacture substantially the same products, including chopper boxes.

The trial court found that there was nothing in the record to show that any of the successive business organizations had expressly or impliedly agreed to assume liabilities of their predecessors.

On January 30, 1978, Calvin Tift and his father commenced an action against Forage King Industries and its insurance company, Auto-Owners Insurance Company. The complaint alleged that Auto-Owners was the insurer of Forage King at the time Calvin was injured. It alleged that the present Forage King Industries, Inc., was a successor to the manufacturer of the chopper box and was, accordingly, responsible for the accident. The complaint purported to state alternative causes of action in negligence and in strict liability.

No facts were disputed on the motion for summary judgment, and accordingly the trial court decided the case as a matter of law and held that there was no liability. It relied upon the rule set forth in *Leannais v. Cincinnati, Inc.*, 565 F.2d 437, 439 (7th Cir. 1977), ". . . that a corporation which purchases the assets of another corporation does not succeed to the liabilities of the selling corporation."

The trial court recognized that there are, however, four well-recognized exceptions under which liability may be imposed upon a purchasing corporation:

"(1) when the purchasing corporation expressly or impliedly agreed to assume the selling corporation's lia-

bility; (2) when the transaction amounts to a consolidation or merger of the purchaser and seller corporations; (3) when the purchaser corporation is merely a continuation of the seller corporation; or (4) when the transaction is entered into fraudulently to escape liability for such obligations." *Leannais, supra* at 439.

The trial court found none of these exceptions applicable and, accordingly, applied the general rule of corporate law that, where one company sells or otherwise transfers all of its assets to another company, the transferee is not liable for the debts and liabilities of the transferor. Fletcher, *Cyclopedia Corporations*, Vol. 15, sec. 7122, p. 188. The trial court placed heavy emphasis upon the fact that the chopper box in question had been built by a predecessor sole *proprietorship* and, therefore, the present Forage King Industries, Inc., could not be a successor *corporation* to the original manufacturer, because the original manufacturer was not a corporation. The Court of Appeals followed the same reasoning in affirming the trial court judgment.

Turning first to the position of both the trial and appellate courts that there cannot be a corporate successor unless the predecessor was a corporation, we conclude that the responsibility of a subsequent business organization, irrespective of the nature of either the predecessor or successor, proprietorship, partnership, or corporation, cannot be facilely dismissed on the basis of the semantics of the rule. There is, of course, some rationality to the position taken by the Circuit Court and the Court of Appeals. As the court of appeals said at 331:

"When a corporation is purchased by a second corporation, the first disappears as a legal entity and, consequently, cannot be sued."[2]

---

[2] This, of course, is not always true. The more important question is whether the corporation or predecessor is merely a hollow shell or is it an entity with assets answerable to judgments.

The court of appeals, however, recognized the paramount policy reasons for imposing liability on a business which succeeds another because:

"[N]o corporation should be permitted to place into the stream of commerce a defective product and avoid liability through corporate transformations or changes in form only." At 331.

The court of appeals concluded, however, that this obviously correct principle had no application in the instant case because Wiberg, who had operated as a sole proprietorship when he built the chopper box, remained available as a defendant subject to suit, and therefore necessity did not require that any successor business organizations be defendants.

We have no quarrel with the court of appeals' decision that Wiberg has not absolved himself from liability and remains a proper defendant, but logic does not lead to the conclusion that, because Wiberg is a proper defendant, his successor business organizations cannot be also. The basic logic of the court of appeals' position leads rather to the conclusion that successor corporations may be sued, as well as the original proprietorship, which manufactured the chopper box. It seems reasonably clear that the court of appeals, based on the principle it enunciated, would have found liability as a matter of policy, had the predecessor manufacturer been a corporation rather than a proprietorship. We hold as a matter of law that the rule and its exceptions are applicable, irrespective of whether a prior organization was a corporation or a different form of business organization.

It should be emphasized that the corporate rule that exempts a successor company from the liabilities of its

Statutes will affect the answerability of a defunct corporation to subsequent lawsuits.

predecessor when it has purchased the assets of the predecessor is subject to the four exceptions recited in *Leannais, supra,* and considered by the trial court and Court of Appeals.[3]

Two of these exceptions, the first and the fourth, are unrelated to the problem at hand, for where there is an express or implied assumption of the selling corporation's liabilities—tort, contract, or both—the problem is obviated; and where the transaction is fraudulent, protection is afforded under the law of fraudulent conveyances. The other two "exceptions" are, however, relevant to our discussion of the purposes and policies behind causes of action for tort. These exceptions are not really exceptions at all, for when applicable they swallow up the rule of nonliability.

The second exception is that there is liability when the transaction amounts to a consolidation or merger (*de facto* or otherwise) of the purchaser and seller corporations. The third "exception" exists when the purchaser corporation is merely a continuation of the seller corporation. When viewed in the context of a tort caused by a defective product, these two "exceptions" merely recite that, where either one is applicable, there is "identity," because in substance the successor business organization which the plaintiff sues is, despite organizational metamorphosis, the same business organization which manufactured the product which caused his injury.

As Fletcher, *supra,* points out, the rule and its exceptions were designed initially to protect contract or quasi-contract creditors of a dissolved business organization and, hence, as a general group, all four exceptions are irrelevant to tort except as to the extent that the second and third exceptions are indicia of "identity." These

---

[3] *See,* Frumer & Friedman, *Products Liability* (Matthew Bender 1981), sec. 5.06, Sale or Merger of Manufacturer; Liability of Successor and Dissolved Corporation.

exceptions are declaratory of tests to be applied to encourage "piercing the corporate veil" and to look to the substance and effect of business transformations or reorganizations to determine whether the original organization continues to have life or identity in a subsequent and existing business organization.

They can be viewed also as tests for "privity" with the subsequent organization even if the dealings were only between the original business organization and the ultimate consumer or the party injured.

Exceptions two and three to the corporate rule demonstrate that, when it is the same business organization that one is dealing with, whether it be by consolidation, merger, or continuation, liability may be enforced. These are tests of identity. Suit is possible in these circumstances, because there would be privity with the actual seller or manufacturer, *i.e.*, the exceptions are guidelines to determine under what circumstances the original entity continues to exist, albeit in an altered form.

By applying these rules of corporate law, it is apparent, either by application of exception two or three that the present corporation is the same as the prior organization, *i.e.*, it has substantially the same identity although transformed by merger, consolidation, etc. Hence, an injured party who dealt with the predecessor organization could sue the successor. Where a defendant has retained the same identity, though perhaps not the same name or form of organization, the element of privity is satisfied.

If there is business succession, then in effect the plaintiff is suing the "same" business that produced the original product. Under such a state of facts, a novel or unusual problem is not presented. A court merely need determine that the defendant, despite business transformations, is substantially the same as the original manufacturer. This is the application of existing

corporate law; and such law governs the decision in this case, because it is clear that there is identity between the original manufacturer and the present Forage King Industries, Inc.

It should be emphasized, however, that the possible fixing of liability on the subsequent manufacturer of the product line does not necessarily exonerate the prior manufacturer of the defective product. The present organization may well have the right of indemnity. What is important, however, is that the plaintiff may seek recourse against either. Where the burden of payment eventually falls between an existing organization that was a prior manufacturer and a present manufacturing organization that is a continuation of the former ought not be a concern of an injured plaintiff.

Our case, however, is a clear case of "identity." The present Forage King Industries, Inc., is, for the practical purposes relevant to consumer protection, the continuation of the same entity as that operated as a sole proprietorship by Wiberg.

The present Forage King Industries, Inc., acquired all the assets of Forage King Industries, which was incorporated originally by Wiberg and Nedland in 1968, and that business organization derived its assets by taking over all the assets of the partnership of Wiberg and Nedland, which in turn derived its assets from the sole proprietorship of Wiberg, which actually built the defective forage box in 1961 or 1962. Essentially the same manufacturing operation and the manufacture of the same product, the forage box, was continued through all these organizational transformations. The present corporation is in fact substantially identical to the organization that manufactured the allegedly defective chopper box and is therefore liable. Only the form of business organization has changed.

The defendant, Forage King Industries, Inc., argues, however, that not only is the fixing of liability inappropriate under the traditional tests and the exceptions to the general corporate rule of no successor liability, but also that the policy concern expressed in some cases that there can be no one to respond to the injured claimant if the successor organization is not answerable is simply not applicable in this case. The defendant states that the plaintiffs' concern should properly be "whether after merger or consolidation of two corporations the former corporation no longer exists and is not available to suit," but this concern, defendant asserts, is not present in the instant case, because Wiberg or, alternatively, Nedland, or the partnership of the two is still available for suit, because they, as individuals "are still available."

The defendant also points out that, where, as here, a sole proprietorship has sold out, there is no reason to assume, as a matter of social policy, that that former sole proprietor is unable to answer in damages and that, even under the traditional exceptions, unless the sale is for less than adequate consideration or is fraudulent, it should be assumed that the original proprietors are able to respond to lawfully imposed liabilities and pay damages. This may well be; and, of course, Wiberg has not been dismissed from the suit. As we have pointed out above, Wiberg might well, under the procedural posture of this case, be responsible in indemnity to the present Forage King Industries, Inc.

In effect, then, Forage King Industries, Inc., is arguing that in the instant case there is indeed another and different "deep pocket" from which the plaintiffs might recover. This may be relevant in the event of an attempt of recovery over by the present corporation against the original sole proprietor, but it does not dispel the potential liability of Forage King Industries, Inc., to the plaintiffs. Whether there can be a recovery over by

a successor organization need not concern a plaintiff. We are not at this stage of the proceedings concerned with the validity of the present corporation's claim over against the proprietor of a predecessor organization.

In the instant case, the record does not reveal whether Wiberg is judgment-proof, as the plaintiffs have asserted. If he indeed is, and we were to adopt the position espoused by the defendant, there could be no meaningful recovery against him.

Basically, however, all that the argument of the defendant tends to prove is that both the predecessor and the successor manufacturers are in a better position to spread the cost and assume the liability than is a helpless plaintiff. The undercurrent of the defendant's argument, of course, is that the predecessor organization, Wiberg's sole proprietorship, is in fact "morally" responsible and at fault and should therefore be the only entity answerable in damages. However, as we have pointed out, the present Forage King Industries, Inc., is substantially the identical organization that manufactured the defective box and is answerable to an injured plaintiff by the same reasoning that the original manufacturer would be.

We hold that the present Forage King Industries, Inc., is substantially the same business organization that manufactured the allegedly defective implement. We arrive at that conclusion by the application of traditional tests for successor liability. The present organization, although it has undergone a structural metamorphosis remains in substance the identical organization manufacturing the same product. It is liable for the defective product manufactured by the original business organization.

Under the facts of this case, we conclude that Forage King Industries, Inc., the present operating company, is not, as determined by the trial court, as a matter of law

free of any possible liability. We therefore reverse the decision of the Court of Appeals, reverse the summary judgment dismissing the complaint, and remand for trial.

*By the Court.*—Decision reversed, and cause remanded for trial.

CECI, J., took no part.

DAY, J. *(dissenting)*. I dissent. I agree with that portion of Justice Callow's dissent which points out that, even if one accepts the majority's theory that the form of the predecessor business organization, be it sole proprietorship, partnership or corporation, is irrelevant to the imposition of successor liability, the record in this case does not support the conclusion that Forage King Industries, Inc. is either a merger, consolidation or continuation of Woodrow W. Wiberg's sole proprietorship which manufactured the allegedly defective chopper box. *Leannais v. Cincinnati, Inc.*, 565 F.2d 437, 439 (7th Cir. 1977). For that reason, I would hold that Forage King Industries, Inc., is entitled to summary judgment dismissing it from this action.

WILLIAM G. CALLOW, J. *(dissenting)*. The majority has, in a decision barren of citation or precedent, and contrary to the law it purports to apply, held a successor corporation responsible for the preceding, totally independent action of a three-transaction removed (Wiberg-Nedland partnership; Forage King Industries, Inc.; Forage King Industries, Inc./Tester Corporation) sole proprietor. It purports to do so by proclaiming that "it is irrelevant that the predecessor business organization was a sole proprietorship." Incorrectly applying well-established intercorporate principles, the majority concludes that the present corporation "is substantially the same business organization that manufactured the al-

legedly defective implement." *Supra,* at 73 and 82. I believe there is a fundamental and reasonable distinction in the law between a sole proprietorship and a corporation with respect to the issue of successor liability. I further believe the majority's determination that Forage King Industries, Inc./Tester Corporation is "a mere continuation" of Woodrow Wiberg's sole proprietorship contravenes the well-established traditional test and its exceptions for successor corporation nonliability. Accordingly, I dissent.

The majority correctly states that " 'a *corporation* which purchases the assets of another corporation does not succeed to the liabilities of the *selling corporation.'* " *Supra,* at 75 (emphasis added). *Forest Laboratories, Inc. v. Pillsbury Company,* 452 F.2d 621, 625 (7th Cir. 1971) ; *Armour-Dial, Inc. v. Alkar Engineering Corp.,* 469 F. Supp. 1198, 1201 (E.D. Wis. 1979) ; *Bazan v. Kux Machine Company,* 358 F. Supp. 1250, 1251 (E.D. Wis. 1973) ; 15 W. Fletcher, *Cyclopedia of The Law of Private Corporations,* sec. 7122 (rev. perm. ed. 1973) ; Note, *Expanding the Products Liability of Successor Corporations,* 27 Hastings L.J. 1305, 1310–11 (1976). This general rule of nonliability "accords with the fundamental principle of justice and fairness, under which *the law imposes responsibility for one's own act and not for the totally independent acts of others." Leannais v. Cincinnatti, Inc.,* 565 F.2d 437, 439 (7th Cir. 1977) (emphasis added).

As the majority has correctly noted, there are four narrowly viewed[1] yet recognized exceptions to the gen-

---

[1] "Although courts have greatly expanded the types of persons who may be liable in a products liability action, such persons generally are found within the chain of distribution of the injury-causing product. Since a successor corporation is technically outside the chain of distribution, development of this area of liability has been more hesitant." 1 L. Frumer and M. Friedman, *Products Liability,* sec. 5.06[1] (1982) (footnote omitted).

eral rule of nonliability where a court will find it equitable to impose responsibility upon a successor corporation for a predecessor corporation's defective products. The majority states that "all four exceptions are irrelevant to tort." Nevertheless, it purportedly adopts two exceptions to find that "the present corporation is the same as the prior organization, *i.e.*, it has substantially the same identity although transformed by merger, consolidation, etc." *Supra,* at 79.

The majority accepts the trial court's conclusion that exception one, the express or implied assumption of liability, and exception four, the fraudulent conveyance, "are unrelated to the problem at hand." *Supra,* at 78. The majority, however, believes that exception two, merger or consolidation, and exception three, continuation, are applicable because they "merely recite that . . . there is 'identity.' " *Supra,* at 78. The majority fails to identify any distinction between the concepts of merger, consolidation, continuation, or those concepts it recognizes in its catchall category, "etc."

The majority's first conclusion is that the intercorporate rule of nonliability and its exceptions are applicable to *any business entity* irrespective of its nature because liability should not "be facilely dismissed on the basis of the semantics of the rule." *Supra,* at 76. I would note that the trial judge entered summary judgment in favor of Vernon Nedland holding: " '[w]here a partnership is organized to take over a business, neither the firm nor its members are liable for a tort committed before its organization by the person who formerly conducted such business.' " *See* 60 Am. Jur. 2d *Partnership* sec. 163 (1972). The plaintiff apparently acknowledges this as he no longer pursues recovery against Nedland. The majority refused to treat this issue and summarily states liability will attach regardless of the form of the business entity.

The majority concedes there is "some rationality" to the positions taken by both the circuit court and court of appeals that " '[w]hen a corporation is purchased by a second corporation, the first disappears as a legal entity and, consequently, cannot be sued.' " *Supra,* at 76. I submit this is more than rational, it is foundational. A corporation is a creature of statute which is created and extinguished by law. If it is dissolved, its directors are required by statute to make adequate provision for *known* debts and liabilities for a specified period of time, but after the statutory period expires, it has no legal existence and, consequently, cannot be sued. A sole proprietor, even after termination of the business activity, remains a viable defendant for suit and, as the *Leannais* court prescribed, will remain responsible for his own acts.

The court of appeals concluded that the instant case did not fall within the policy ambit for imposing intercorporate liability, namely, "no corporation should be permitted to place into the stream of commerce a defective product and avoid liability through corporate transformations or changes in form only." *Tift v. Forage King Industries, Inc.,* 102 Wis. 2d 327, 331, 306 N.W. 2d 289 (Ct. App. 1981). The significant identity distinction is that in the case, as here where we are dealing with a sole proprietor, the responsible party is capable of being sued; the sole proprietor *cannot* place a defective product in the stream of commerce and avoid liability through incorporation. The majority indefensibly opines that "[w]hat is important, however, is that the plaintiff may seek recourse against either [Wiberg or Forage King Industries/Tester Corporation]." *Supra,* at 80. In the present case, imposition of liability on Forage King Industries/Tester Corporation in this million dollar lawsuit actually results in a "windfall" to the plaintiff who has been given a remote additional party to sue. This does not accord with the fundamental principles of jus-

tice and fairness articulated in *Leannais* where the law imposes responsibility for one's own act and not those totally independent acts of others. 565 F.2d at 439. Because the majority has not cited any authority in support of its conclusion, I can only believe that it seeks not to apply the law as it is; it seeks to mold the law in the image it wishes it to be.

Although I believe the intercorporate rule is inapplicable to the present case, I will address the majority's second and erroneous conclusion that the corporate exceptions for de facto merger and/or continuation impose liability.

According to case law, subject to specific conditions, if a purchase of assets amounts to a merger,[2] or if it accomplishes a mere continuation of the seller, the purchasing corporation assumes—by operation of law—the liabilities of the seller. *E.g., Knapp v. North American Rockwell Corp.*, 506 F.2d 361, 364 (3d Cir. 1974), *cert. denied*, 421 U.S. 965 (1975); *Forest Laboratories Inc. v. Pillsbury Co.*, 452 F.2d at 625; *Shannon v. Samuel Langston Company*, 379 F. Supp. 797, 800–01, (W.D. Mich. 1974).

It is the absence of the necessary specific conditions which frustrate the majority's conclusion in the instant case. I would point out that there are two minimum con-

---

[2] A merger differs from the sale of corporate assets in the following respect: A merger is the absorption of one corporation by another, with the buying corporation retaining its name and corporate identity but adding the capital and powers of the merged corporation. A sale of corporate assets is a vehicle through which the vendor parts with its entire interest in exchange for cash and nothing more. 15 W. Fletcher, *Cyclopedia of The Law of Private Corporations*, secs. 7041 and 7044 (rev. perm. ed. 1973). A de facto merger occurs where the acquisition closely resembles a statutory merger, but the statutory formalities have not been observed. *See* Note, *Assumption of Products Liability in Corporate Acquisitions*, 55 B. U. L. Rev. 86, 96–100 (1975).

ditions precedent to the imposition of liability under the de facto merger or continuation exceptions: (1) the seller must quickly dissolve, and (2) the consideration for the sale of assets must be shares of the purchaser which are distributed to the seller's shareholders. *Expanding the Products Liability of Successor Corporations,* 27 Hastings L.J. at 1318; Comment, *Products Liability and Successor Corporations: Protecting the Product User and the Small Manufacturer Through Increased Availability of Products Liability Insurance,* 13 U.C.D. L. Rev. 1000, 1008–09 (1980); *See* 1 Frumer and Friedman, *supra* sec. 5.06[2][b]; *See also Bazan v. Kux Machine Co.,* 358 F. Supp. at 1252; *Kloberdanz v. Joy Manufacturing Company,* 288 F. Supp. 817, 821–22 (D. Colo. 1968) (applying California law); *McKee v. Harris-Seybold Co.,* 109 N.J. Super. Ct. Law Div. 555, 565–67, 264 A.2d 98, 105–06 (1970), *aff'd per curiam,* 118 N.J. Super. Ct. App. Div. 480, 288 A.2d 585 (1972); *Farris v. Glen Alden Corp.,* 393 Pa. 427, 437, 143 A.2d 25, 31 (1958).

"A sale of assets for stock transfers an ownership interest in the purchaser to the selling corporation. When the seller dissolves and distributes the purchaser's stock to the seller's shareholders, those shareholders are left as owners of the purchaser. For all practical purposes, a merger has occurred because the property of the dissolved corporation is held by another corporate entity which is, in part, owned by those who were once shareholders of the seller. When, on the other hand, the sale is for the purchaser's cash, only property is transferred to the purchaser, and the selling corporation's shareholders are left with no interest in the buyer. In this situation, neither a merger nor a continuation has occurred."

*Expanding The Products Liability of Successor Corporations,* 27 Hastings L.J. at 1319 (footnotes omitted); 1 Frumer and Friedman, *supra* at sec. 5.06[2][b] ("The major consideration necessary for a traditional de facto merger is transfer of assets for *stock.*") (emphasis in

original). *Accord Travis v. Harris Corp.*, 565 F.2d 443, 447 (7th Cir. 1977); *See Turner v. Bituminous Casualty Co.*, 397 Mich. 406, 449, 244 N.W.2d 873 (1976) (Coleman, J., dissenting). The majority, without explanation, fails to mention these two pivotal points; of course, I believe, if it had recognized them, the majority would have been obliged to reach the result I embrace. The majority opines that "the exceptions are guidelines to determine under what circumstances the original entity continues to exist." *Supra,* at 79. I would assert that where the original entity, the manufacturer of the allegedly defective box, Woodrow Wiberg, continues to exist, there is no compelling reason for this court to invoke a legal fiction to determine if he exists elsewhere.

I think it significant that the trial court made the following findings regarding continued ownership under exceptions two and three to the traditional intercorporate rule concerning the nonliability of Forage King Industries/Tester Corporation:

"TWO: In the facts of this case, a merger involving the actual obsorption [sic] of a corporation into another with the former losing its existence as a separate corporate entity is not here present. Forage King has not lost its corporate entity; moreover, there is no showing that Mr. Wiberg, when he sold out to Tester, obtained either Forage King Industry stock or Tester stock. He sold the corporate assets; the assets were accepted and management of Forage King was transferred apparently to representatives of the Tester Corporation.

"THREE: ' "when the purchaser corporation is merely a continuation of the seller corporation." ' As indicated on the Affidavits and pleadings in this case, there is no common identity of officers, directors and stockholders in the selling and purchasing corporations. Mr. Wiberg is out; the new directors are in."

Plaintiff himself asserts in his brief: "Mr. Wiberg is *not in any way* presently associated with Forage King

Industries." (Emphasis added.) My review of the record reveals that these factual conclusions are correct and are not challenged by either the parties or the majority.

The majority appears to have given a superficial analysis to the continuation exception related to Wiberg's sole proprietorship and Forage King Industries/Tester Corporation. The majority articulates the following indicia of continuity, or as it terms it, identity: "Essentially the same manufacturing operation and the manufacture of the same product . . . was continued," *Supra,* at 80, "Forage King Industries, Inc., is, for the practical purposes relevant to consumer protection, the continuation of the same entity as that operated as a sole proprietorship by Wiberg." *Id.;* "Forage King Industries, Inc., remained at the same location and continued to manufacture substantially the same products, including chopper boxes." *Supra,* at 75.[3] Close examination of the majority opinion reveals the sole indicia of continuity under which the majority has imposed liability is that Forage King Industries/Tester Corporation "continued" essentially the same manufacturing operation and manufactured the same product. I would emphasize that "[t]he gravamen of the traditional 'mere continuation' exception is the continuation of the *corporate entity* rather than continuation of the business operation." 1 Frumer and Friedman, *supra* at sec. 5.06[2][c] (emphasis in original). *See Travis v. Harris Corp.,* 565 F.2d at 447 (where there is no identity of stock, stockholders or directors, there was no continuation); *Lopata v. Bemis*

---

[3] Although the majority does not point it out, the defendant disputes the plaintiff's claim that it manufactured the same product.

A reading of the facts as set out in the majority opinion reveals that Wiberg's sole proprietorship operated at Prairie Farms, Wisconsin. When the Tester Corporation purchased Forage King Industries, Inc., it was located in Ridgeland, Wisconsin. Thus there was no "identity" of location.

*Company, Inc.,* 383 F. Supp. 342, 345 (E.D. Pa. 1974) ; *National Dairy Products Corp. v. Borden Company,* 363 F. Supp. 978, 980 (E.D. Wis. 1973) ; *Kloberdanz v. Joy Manufacturing Co.,* 288 F. Supp. at 821 (continuation exception is akin to a reorganization of a corporation) ; *Turner v. Bituminous Casualty Co.,* 397 Mich. at 449 (Coleman, J., dissenting) (continuation exception is actually a reorganization). The majority has taken unwarranted liberty in its analysis of the continuation and merger exceptions, ignoring the strict requirements the law imposes under these exceptions. "Conclusions of law cannot be a substitute for essential facts." *Schneider Fuel & Supply Co. v. Thomas H. Bentley & Son,* 26 Wis. 2d 549, 553, 133 N.W.2d 254 (1965).

The majority declines to accept the products liability approach to successor liability advanced to this court by the plaintiff. The majority declares its intent to follow the standards of the seventh circuit decision adopted in *Leannais* where that court, applying Wisconsin law, denied liability under the circumstances such as we have here. I cannot understand how the majority can apply the *Leannais* traditional intercorporate approach and then reach an opposite conclusion and impose liability on Forage King Industries/Tester Corporation. Perhaps the majority's unarticulated sympathy with the rationale underlying the strict liability approaches which focus on the continuation of the manufacturing process has been reflected in an expanded continuation theory of its own making.

I address the two new theories of recovery, "product line" and "expanded continuation," initiated by the California and Michigan courts to declare that I would refuse to recognize a strict liability approach to the issue of successor corporation liability for defective products placed in the stream of commerce by a predecessor corporation.

Fifteen years ago in *Dippel v. Sciano,* 37 Wis. 2d 443, 155 N.W.2d 55 (1967), this court adopted the concept of the imposition of liability irrespective of privity of contract.[4] I would emphasize that the *Dippel* decision makes a determination of *responsibility* the pivotal point for imposing strict liability on a manufacturer.[5] The entire basis of imposing strict liability on a manufacturer is

[4] Wisconsin's adoption of strict liability may be characterized as follows: Justice Hallows, in his concurring opinion in *Dippel v. Sciano,* 37 Wis. 2d 443, 464, 155 N.W.2d 55 (1967) (Hallows, J., concurring), made it clear that this court has concluded: "What we mean is that a seller who meets the conditions of sec. 402A, Restatement, 2 Torts 2d, in Wisconsin is guilty of negligence as a matter of law and such negligence is subject to the ordinary rules of causation and the defense applicable to negligence. While the Restatement . . . imposes a strict liability regardless of the negligence of the seller, we do not."

Other portions of the *Dippel* opinion shed further light on this proposition: "[T]he strict liability of the seller of a defective product . . . . is much more akin to negligence per se." *Id.* at 461. "From the plaintiff's point of view the most beneficial aspect of the rule is that it relieves him of proving specific acts of negligence and protects him from the defenses of notice of breach, disclaimer, and lack of privity in the implied warranty concepts of sales and contracts." *Id.* at 460. "[T]he rule of strict liability, . . . which this court now adopts, *is not a rule of absolute liability.* This is wholly apart from any consideration of such defenses as contributory negligence or assumption of risk." *Id.* at 463 (emphasis in original) (Currie, C.J. concurring).

[5] The *Dippel* court quotes from the landmark decision in *Greenman v. Yuba Power Products, Inc.,* 59 Cal. 2d 57, 63, 377 P.2d 897 (1963), where California specifically abandoned the use of warranty concepts. The *Greenman* court opined that "[a] manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being. . . . The purpose of such liability is to insure that the costs of injuries resulting from defective products are borne by the manufacturers *that put such products on the market.*" *Id.* at 62–63 (emphasis added).

In another landmark decision, *Escola v. Coca Cola Bottling Co.,* 24 Cal. 2d 453, 150 P.2d 436 (1944), the California supreme court

that the manufacturer is responsible for placing a defective product in the stream of commerce. "The cornerstone of strict liability rests upon the defendant's active participation in placing the allegedly defective product into commerce." *Domine v. Fulton Iron Works*, 76 Ill. App. 3d 253, 257, 395 N.E.2d 19, 23 (1979). This is clearly not the case with a successor corporation.

As the seventh circuit in *Leannais* concluded "There is an *essential difference* between the fixing of responsibility upon manufacturers or sellers for their own acts and transferring that responsibility to a purchasing corporation innocent of and having no control over those acts. The latter may be good policy or bad, but it is not the policy set forth in *Dippel*." 565 F.2d at 441 n. 8 (emphasis added).

The general rationale in other jurisdictions behind extending the strict liability of a manufacturer for a defective product to a successor corporation is threefold. It is argued that a successor corporation should be held liable because: (1) It can protect itself by purchasing insurance and can pass on the cost of the insurance to the consumer; (2) It has the knowledge of possible hazards of the product manufactured by a predecessor and has the ability and incentive to improve the product and control the risk; and (3) It benefits from the goodwill

---

imposed liability on the manufacturer and concluded: "[P]ublic policy demands that responsibility be fixed wherever it will most effectively reduce the hazards of life and health inherent in defective products that reach the market. It is evident that the manufacturer can anticipate some hazards and guard against the recurrence of others. . . . [T]he risk of injury can be insured by the manufacturer and distributed among the public as a cost of doing business. . . . If such products nevertheless find their way into the market it is to the public interest *to place the responsibility* for whatever injury they may cause *upon the manufacturer, who*, even if he is not negligent in the manufacture of the product, *is responsible for its reaching the market.*" *Id.* at 462 (Traynor, J., concurring) (emphasis added).

and reputation engendered by the predecessor's product and should bear the corresponding burden of liability for any defect in the predecessor's product. *See Expanding the Products Liability of Successor Corporations,* 27 Hastings L.J. at 1322. I conclude that the policy enunciated by this court in *Dippel* is not applicable to the issue of successor liability. I believe that the aforementioned threefold rationale is defeated by its application to successor corporations, *particularly* in a case such as this where the plaintiff has a remedy against the party who manufactured and placed the product into commerce long before Forage King ever became involved with the product.

Examination of the first rationale for the imposition of liability on successor corporations, the successor's protection through the purchase of insurance, reflecting its cost in increased produce prices, reveals that it is illusory. I question whether the successor purchasing corporations may, realistically, be able to obtain open-ended products liability policies to cover them for any accident occasioned by a predecessor's defective product which was produced and distributed in the stream of commerce prior to the acquisition.

Presently, 90 percent of the nation's manufacturing enterprises are comprised of small manufacturing corporations.[6] Statistics reveal that 21.6 percent of those businesses seeking products liability insurance could not obtain it.[7] As one recent commentator concluded: "Most

---

[6] Comment, *Products Liability and Successor Corporations: Protecting the Product User and the Small Manufacturer Through Increased Availability of Products Liability Insurance,* 13 U.C.D. L. Rev. 1000, 1003 (1980) [citing 25 *Encyclopedia Americana* 48 (1976) (hereinafter cited as *Products Liability and Successor Corporations*)].

[7] *Ramirez v. Amsted Industries, Inc.,* 86 N.J. 332, 360, 431 A.2d 811 (1981) (Schreiber, J., concurring) [quoting *Products Liability Insurance: Hearings Before the Subcommittee on Capital, Invest-*

small corporations are unable to secure policies covering liability for injuries caused by the predecessor's products. When such insurance is available, the cost is often prohibitive."[8] As I see it, the inability of small corporations

ment and Business of the House Committee on Small Business, 95th Cong., 1st Sess. (Part I) 4 (1977) (testimony of Charles W. Whalen, Jr.)].

[8] Products Liability and Successor Corporations, supra note 6 at 1003. "[T]here is one fact that remains unchallenged by anyone: product liability insurance premiums have escalated over the past 2 years in varying degrees, from 100 to as much as 1,000 percent or more for some policyholders, and it is the small businessman who is experiencing the most difficulty in adjusting to these escalations." Impact of Product Liability on Small Business: Hearings Before the Select Committee on Small Business, S. Rep. No. 629, 95th Cong., 2d Sess., 167 (1978) (hereinafter cited as Hearings).

The Subcommittee on Consumer Protection and Finance of the 96th Congress concluded: "To a large extent, the distinction between unavailability and unaffordability is elusive: If the insurance is obtainable only at a prohibitively high price, then such insurance is tantamount to being unavailable, at least from the vantage point of the prospective insured." Hearings Before the Subcommittee on Consumer Protection and Finance of the Committee on Interstate and Foreign Commerce House of Representatives, 96th Cong., 1st Sess., 13 (1979) (hereinafter cited as Hearings II).

Many small corporations' insurance cost has increased dramatically even though they have had few, if any, claims settled against them. An example of the dramatic rate increase is revealed through the following testimony of a small manufacturer before the Senate Small Business Committee: "My sudden interest in this field has been occasioned by an increase in my insurance premium from $1,200 in 1974–75 to $8,850 in 1976. While that may not sound like much of a horror story, we've recently been advised that our coverage will be cancelled unless we come up with the princely sum of $74,000 for 1977. . . . (We) have never been named in an action nor have we or our insurance company ever paid a claim." Hearings at 170.

The following chart on the cost of product liability insurance for one small business is illustrative of products liability rate increases:

to obtain insurance for successor liability for the acts of predecessors undermines the rationale and legitimacy of this basis for imposing a strict liability approach.

Even if the bulk of the manufacturing industry could obtain products liability insurance to cover the cost of

### COST OF PRODUCTS LIABILITY

| | Under-lying Limits Cost | $ Coverage | Umbrella Cost | $ Coverage | Total Cost |
|---|---|---|---|---|---|
| 1978 | $61,987 | $300,000 | $73,442 | $5,000,000 | $135,429 |
| 1977 | 51,469 | 300,000 | 44,000 | 5,000,000 | 95,469 |
| 1976 | 8,160 | 300,000 | 1,250 | 5,000,000 | 9,410 |
| 1975 | 4,823 | 300,000 | 1,250 | 5,000,000 | 6,043 |
| 1974 | 4,571 | 300,000 | 1,250 | 5,000,000 | 5,821 |
| 1973 | 4,571 | 300,000 | 350 | 1,000,000 | 4,921 |
| 1972 | 4,571 | 300,000 | 350 | 1,000,000 | 4,921 |

| | Year to Year % Increase in Premiums | % Increase Since 1972 |
|---|---|---|
| 1973 | 0% | 0% |
| 1974 | 18% | 18% |
| 1975 | 3% | 23% |
| 1976 | 55% | 91% |
| 1977 | 1,014% | 1,940% |
| 1978 | 42% | 2,752% |

*Hearings II* at 124 (testimony of Frank W. York, President, Newman Machine Co., Inc.). *See also Products Liability and Successor Corporations, supra* note 6 at 1024–25.

The Subcommittee on Consumer Protection and Finance of the 96th Congress noted: "In sum, our study of the insurance industry indicates it is unable to justify the rates presently being charged many businesses, and in testimony before the Subcommittee, several insurance industry witnesses have admitted embarrassment in their inability to do so; however, while the Subcommittee has been unable to determine whether specific rates charged are excessive, there appears to have been a general panic pricing of product liability insurance. The insurance industry is entirely unable to justify its activities." *Hearings II* at 21.

any injury associated with a predecessor's product, this cost probably could not be passed on to the consumer through increased prices. Small corporations are at a definite disadvantage vis-a-vis larger competitors in passing through the cost of liability insurance.

"[T]heir ability to pass on the costs are limited. They are limited by the pricing performance of their major competitors. Generally what happens, and there are some exceptions, particularly various specialty-type products, is that the major corporations, major businesses in the country will set the parameters of the price. The small firm cannot leave those parameters without coming into some serious problems."[9]

Larger corporations, because frequently they are more diversified, are more able to spread product liability costs and to discontinue higher-cost product lines. The modestly sized one or two product manufacturer has little or no flexibility. Spiraling inflation, coupled with the competitive nature of industry, prohibits the passing on of increased costs through product prices. Small corporations must accept either decreased profitability or business termination. The loss of jobs and production resulting from the latter is clearly unacceptable.[10]

The second basis for the imposition of a strict liability approach is equally indefensible. According to this rationale, the successor corporation has the knowledge necessary to improve the product and the imposition of liability acts as an incentive to ensure the product's improvement. First, improvement of a product line has no

[9] *Hearings, supra* note 8 at 168–69 (footnote omitted).

[10] *Id.* at 169. "The intrusion of rising product liability costs on profits was illustrated by Howard Bruns, speaking for the sporting goods industry, when he told the committee that profits for that industry have declined 50 percent in the last 2 years and one factor of the decline has been an increase over the same period in product liability costs from 'a fraction of a penny to over 6 cents on the dollar.' " *Id.*

relevance to injuries caused by products marketed before the correction. "Although liability for its predecessor's defectively designed products may induce the successor to change its design to prevent future injuries, the inducement would be equally strong if the successor were simply alerted to such mishaps." *Expanding the Products Liability of Successor Corporations,* 27 Hastings L.J. at 1322.

This rationale also appears to presuppose that a successor corporation knows where the predecessor's products have gone and can notify the product owners of the need to correct any defects. I contend that in most cases a successor corporation has no means of recalling and modifying the predecessor's product to ensure that the product meets current standards. As exemplified by the instant case, the product may have been manufactured twenty years ago. Yet, it is contended that the successor must face products liability claims flowing from the old products. I believe this imposes an unreasonable burden on a successor corporation. The acquiring corporation would be playing Russian roulette because it had no control over the quality of manufacture of the product put in commerce before the acquisition. Such a conclusion certainly puts a damper on the sale of manufacturing businesses, for no purchase price could reasonably anticipate the costs to a purchaser incident to liability claims for products manufactured prior to the acquisition.

The third rationale has been mentioned in recent cases in the handful of jurisdictions imposing new theories of liability on successor corporations; namely, the fact that the successor corporation enjoys the "goodwill" of the predecessor corporation should impose upon it the corresponding burden of liability for defective products the predecessor has placed in the stream of commerce. The benefit/burden rationale is initially somewhat semantically persuasive, even though I have read no strict lia-

bility cases in this state which apply this "profit" rationale. However, I submit that the benefit, in terms of goodwill flowing from a trade name or established product, was considered and negotiated at the time of the acquisition of the predecessor corporation, and constituted part of the purchase price. The profit earned on the products sold during the previous ownership are the profits which should bear the burden of liability for damages growing out of the failure of those products, not the product manufactured after acquisition. To require the successor corporation to assume liability for any defective products of the predecessor corporation on the basis of acquired goodwill would require, in essence, the successor corporation to pay both at the time of sale and to pay again if claims arise.

Equally troublesome with this goodwill concept as a benefit is how to evaluate it. The majority of cases have not enlightened us as to what goodwill is, or how much goodwill will be considered justification for imposing the burden of liability. Are trade name, retention of customer lists, or a specialty product going to constitute goodwill? Some companies are sold because they do not have a good reputation, and the successor corporation believes it can reverse the public attitude toward the product. It is not unusual for an unsuccessful product line to be made successful by a successor owner with good marketing techniques. If the specific product involved had not, under a concept of goodwill, been successful on the market, would this change the analysis of liability?

Two new theories of liability have evolved to reflect the aforementioned policy considerations to impose strict liability on a successor corporation where traditional principles have provided immunity. The theories are termed "expanded continuation" and "product line," and they have been separately adopted by a mere handful of jurisdictions.

In *Turner v. Bituminous Casualty Co., supra,* the Michigan supreme court, following on the heels of *Cyr v. B. Offen & Co., Inc.,* 501 F.2d 1145 (1st Cir. 1974), expanded the "continuation" exception to the traditional intercorporate rule of nonliability for successor corporations. The *Turner* court removed any distinction between the sale of a predecessor corporation for cash or stock and imposed liability where there was basic continuity of the seller corporation. This continuity included: retention of key personnel, assets, general business, and trade name. Other indicia of continuation included the fact that the seller corporation ceased ordinary business operations, the purchasing corporation assumed those liabilities and obligations of the seller necessary for the continuation of the business, and the purchasing corporation held itself out as the effective continuation of the seller corporation. 397 Mich. at 430. *Accord Cyr v. B. Offen & Co., Inc.,* 501 F.2d at 1154. Under this evidence, the Michigan supreme court concluded that there was "a prima facie case of continuation of corporate responsibility for products liability." 397 Mich. at 430.

The California supreme court in a narrowly tailored decision in *Ray v. Alad Corp.,* 19 Cal. 3d 22, 560 P.2d 3 (1977), adopted a theory of liability termed the "product line" approach where "a party which acquires a manufacturing business and continues the output of its line of products . . . assumes strict tort liability for defects in units of the same product line previously manufactured and distributed by the entity from which the business was acquired."[11] This theory undoubtedly evolved to ex-

[11] *Id.* at 34. The *Ray* case involved the successor corporation's purchase of a predecessor corporation which was in " 'the specialty ladder business' and was known among commercial and industrial users of ladders as a 'top quality manufacturer' of that product." *Ray v. Alad Corp.,* 19 Cal. 3d 22, 26, 560 P.2d 3 (1977). The successor corporation continued to manufacture the "Alad" specialty ladder. *Id.* at 34.

pand the traditional continuation exception where emphasis is placed on continuation of the business entity *not* the manufacturing process.

The *Ray* court articulated three reasons to justify the imposition of liability: First, the virtual destruction of the plaintiff's remedies against the original manufacturer; second, the successor's ability to assume the original manufacturer's risk-spreading role; and third, the fairness of requiring the successor to assume a responsibility for defective products which flows from the goodwill being enjoyed by the successor corporation. *Id.* at 31. The *Ray* court opined that this would preclude any "windfall" to the predecessor which might otherwise be realized from an absence of successor liability in an enhanced purchase price and the liquidation of the predecessor resulting in its avoidance of liability. *Id.* at 34.

I have already discussed criteria two and three within this dissent. The *Ray* court found criterion one most persuasive; namely, that a victim would go uncompensated unless suit could be brought against the successor corporation. *Accord Turner,* 397 Mich. at 419 ("[the plaintiff] has no place to turn for relief except to the second corporation"); *Ramirez v. Amsted Industries, Inc.,* 86 N.J. 332, 351, 431 A.2d 811 (1981) ("the injured plaintiff obviously cannot look to [the predecessor corporation] for a recovery of the damages"); *Cf. Leannais v. Cincinnati, Inc.,* 565 F.2d at 443 (Fairchild, C.J., concurring in part, dissenting in part) (following *Ray* rationale would require destruction of plaintiff's remedy

In *Ray* the successor corporation purchased a thriving business specifically to produce a specialty, arguably, one-of-a-kind product. *Ray* presents an entirely different situation from the instant case. Forage King Industries was not involved with a specialty product, and, arguably, the Tester Corporation did not purchase it because of the chopper boxes manufactured. While I would not impose liability under the facts of *Ray* either, I view this as a significant distinction.

against predecessor corporation) ; *Rawlings v. D.M. Oliver, Inc.,* 97 Cal. App. 3d 890, 900, 159 Cal. Rptr. 119 (1979) (plaintiff might not have satisfactory remedy against predecessor corporation). As the majority has pointed out in its opinion, the plaintiff in the instant action is not without a remedy[12] if he cannot sue the successor corporation. The plaintiff may sue Woodrow Wiberg who, the majority merely states, may be liable for indemnification to Forage King Industries, but this "ought not be a concern of an injured plaintiff." *Supra,* at 80. In the present case, imposition of liability on Forage King Industries simply results in providing the plaintiff with an additional party to sue. Neither *Turner* nor *Ray,* as I read the cases, intend to impose liability upon the successor when the responsible party remains in the lawsuit.

I am particularly troubled by *Ray* and its progeny's failure to define product line. The majority in the instant case comments that Forage King Industries/Tester Corporation manufactured the same product, although this was disputed. Is the fact that the successor corporation, as in the present case, manufactures a chopper box sufficient to impose liability—even if it is a different

[12] Even if a plaintiff has no recourse against a predecessor corporation, stating that he is remediless unless he can sue the successor corporation may be an overstatement. Injured persons may receive compensation through a party in the distributive chain, such as a retailer, through Workers' compensation or from accident and health policies. *See Ramirez v. Amsted Industries, Inc.,* 86 N.J. at 361 (Schreiber, J., concurring).

In the instant case, Mr. Tift has had his medical expenses paid by the Barron County Department of Social Services, and, arguably, any desire to see the costs of compensation spread out through society has been realized. I would also point out that, although Mr. Tift was hospitalized for approximately two months following his injury, he was discharged with an "excellent" overall prognosis and, in fact, was gainfully employed between 42½ and 47½ hours per week in a factory at the time of trial.

type of chopper box as it is asserted to be in the case?[13] What if that portion of the product allegedly causing the injury has been changed, but otherwise the product is the same? Ultimately, would liability be imposed where a successor acquired and continued to manufacture nine out of ten products in the predecessor's product line even when the tenth product produced the injury?

These questions, among others, reveal that any expanded liability of successor corporations is best addressed by the legislature rather than through piecemeal decisions by the court which may create more confusion than resolution. As we wisely recognized in *Holifield v. Setco Industries, Inc.*, 42 Wis. 2d 750, 168 N.W.2d 177 (1969): "Such arguments, pro and con, as to what limitations on bringing to court actions based on products liability and negligent manufacture will best serve the public interest are for the legislature, not the courts, to consider." *Id.* at 758. As we noted in *Holifield,* it is the court's role to interpret and apply the law as it presently exists—not as the court might want it to be. *Id.*

As the seventh circuit in *Leannais v. Cincinnati, supra,* prudently concluded in refusing to impose any new theory of liability upon a successor corporation:

"Courts are ill-equipped, however, to balance equities among future plaintiffs and defendants. Such forays can result in wide-ranging ramifications on society, the contemplation of which is precluded by the exigencies of deciding a particular case presented on a limited record developed by present parties. . . . As the Wisconsin Supreme Court has recognized, such broad public policy issues are best handled by legislatures with their comprehensive machinery for public input and debate." *Id.* at 441.

*See also: Jenkins v. Sabourin,* 104 Wis. 2d 309, 323, 311 N.W.2d 600 (1981), where this court judiciously refused

[13] The chopper box alleged to have caused Mr. Tift's injuries had a cross-apron discharge system, whereas the present models are manufactured with power auger discharge systems.

to adopt the dual capacity doctrine recognized by a minority of jurisdictions to impose additional liability on an employer in a worker's compensation case, concluding: "New liabilities . . . should not be imposed by courts without *compelling* and *well understood* reasons. While a tort remedy could be beneficient [sic] and just in a particular case, such precedent, *unless carefully considered from the viewpoint of general state policy, could well . . . create injustice." Id.* (Emphasis added.)

The majority in the instant case seeks not to provide Calvin Tift with a remedy; it seeks to provide him with an additional, deeper pocket to sue. In my opinion, this contravenes the essence of the traditional intercorporate approach as well as the strict liability approaches.

In conclusion, I believe that the majority has abrogated a significant distinction between a corporation and a sole proprietorship, one designed to comport with notions of fundamental fairness and justice. While a corporation may dissolve its legal status, leaving a plaintiff without a remedy, a sole proprietor remains a viable defendant. I believe that the intercorporate rule of nonliability with its four exceptions applies—and was intended to apply—solely to corporations.

Although I would not apply the intercorporate rule to this case because a sole proprietor is involved, I would comment that, assuming it were applicable, the majority has failed to apply the merger and continuation exceptions to nonliability within their proper legal framework. By elasticizing these narrowly construed exceptions and ignoring their very foundation, the majority has thwarted well-established law. Accordingly, I dissent.